UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

TAMEIKA LOVELL                                                    COMPLAINT

                                                                 JURY DEMAND

                                    Plaintiff,

             -against-

UNITED STATES OF AMERICA; UNITED STATES CUSTOMS
AND BORDER PROTECTION; JOHN DOE 1, as Director, Field
Operations, United States Customs and Border Protection; JOHN
DOE 2, as Chief Officer, United States Customs and Border
Protection; JOHN DOE 3, as Supervisory Officer, United States
Customs and Border Protection; PARKER Shield No.: 24750, as
Officer, United States Customs and Border Protection and MUNOZ
Shield No.: 21455, as Officer, United States Customs and Border
Protection each sued individually and in their official capacities as
employees of Defendant UNITED STATE OF AMERICA and
UNITED STATES CUSTOMS AND BORDER PROTECTION

                                    Defendants'
--------------------------------------------------------------------------------x

        The plaintiff TAMEIKA LOVELL by her attorney The Sanders Firm, P.C., for her

complaint against defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS

AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ, respectfully set forth

and allege that:

## **INTRODUCTION**

        This action concerns constitutional limits on the government's ability to detain, seize then

search a person's most intimate bodily spaces for alleged 'drugs' without judicial oversight or even

reasonable suspicion. Plaintiff a United States citizen, alleges that on or about November 27, 2016,

she returned to the United States from Jamaica, West Indies through the John F. Kennedy Airport

Port of Entry. Plaintiff TAMEIKA LOVELL alleges defendants' UNITED STATES OF

AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3;

PARKER and MUNOZ subjected her to an unlawful 'body cavity' search against her will resulting in no arrest.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 because plaintiff's claims arise under the United States Constitution.

2.      Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) because the incident giving rise to this action occurred within the Eastern District of New York.

## PROCEDURAL REQUIREMENTS

3.      Plaintiff alleges that on or about May 10, 2017, she filed a federal tort claim within the Federal Tort Claim Act with the United States Customs and Border Protection.

4.      Plaintiff alleges that on or about on March 15, 2108, she received notice the United States Customs and Border Protection denied her federal tort claim.

5.      Plaintiff files this federal complaint within the applicable statute of limitations period.

## PLAINTIFF

6.      Plaintiff TAMEIKA LOVELL is a female citizen of the United States of America, over twenty-one (21) years of age and resident of Nassau County.

## DEFENDANTS'

7.      Defendant UNITED STATES OF AMERICA manages government agency defendant UNITED STATES CUSTOMS AND BORDER PROTECTION and is defendants' JOHN DOES 1 -3, PARKER and MUNOZ'S employer.

8.      Defendant UNITED STATES CUSTOMS AND BORDER PROTECTION is a government agency under the jurisdiction of the United States Department of Homeland

Security.

9.      Defendant JOHN DOE 1, as Director, Field Operations, UNITED STATES

CUSTOMS AND BORDER PROTECTION.

10.      Defendant JOHN DOE 2, as Chief Officer, UNITED STATES CUSTOMS AND

BORDER PROTECTION.

11.      Defendant JOHN DOE 3, as Supervisory Officer, UNITED STATES CUSTOMS

AND BORDER PROTECTION.

12.      Defendant PARKER, as Officer, UNITED STATES CUSTOMS AND BORDER

PROTECTION.

13.      Defendant MUNOZ, as Officer, UNITED STATES CUSTOMS AND BORDER

PROTECTION.

## BACKGROUND

14.      Plaintiff that in or around October 2015, under Former Commissioner R. Gil

Kerilkowske, defendants' UNITED STATES OF AMERICA and UNITED STATES CUSTOMS

AND BORDER PROTECTION and the Department of Homeland Security created the U.S.

Customs and Border Protection – National Standards on Transport, Escort, Detention, and Search

(TEDS).

15.      Plaintiff alleges defendants' UNITED STATES OF AMERICA and UNITED

STATES CUSTOMS AND BORDER PROTECTION knows but, condones its employees

intentionally ignoring TEDS in violation of the constitutional rights of U.S. Citizens under the

Fourth and Fifth Amendments of the United States Constitution.

16.      Plaintiff alleges specifically under TEDS Rule 1.4, CBP employees must treat all

individuals with dignity and respect.

17. Plaintiff alleges specifically under TEDS Rule 1.4, CBP employees will perform their duties in a non-discriminatory manner, with respect to all forms of protected status under federal law, regulations, Executive order, or policy, with full respect for individual rights including equal protection under the law, due process, freedom of speech, and religion, freedom from excessive force, and freedom from unreasonable searches and seizures.

18. Plaintiff alleges specifically under TEDS Rule 1.8, every effort must be made to promptly transfer, transport, process, release, or repatriate detainees as appropriate according to each operational office's policies and procedures and is operationally feasible.

19. Plaintiff alleges specifically under TEDS Rule 3.1, all searches must be conducted under the appropriate legal authority and standards.

20. Plaintiff alleges specifically under TEDS Rule 3.1, Officers/Agents must be diligent in their efforts to protect a detainee's legal rights and treat detainees with respect, dignity, and an appropriate level of privacy.

21. Plaintiff alleges specifically under TEDS Rule 3.1, Officers/Agents must consider the totality of the circumstances and articulable factors when making a decision to search.

22. Plaintiff alleges specifically under TEDS Rule 3.1, recognizing the potential intrusiveness of these searches on an individual's sense of privacy, searches must be conducted only with the proper legal authority and justification, with due recognition and deference for the human dignity of those being searched, and in accordance with the operational office's policies and procedures.

23. Plaintiff alleges specifically under TEDS Rule 3.1, each operational office determines search documentation requirements.

24. Plaintiff alleges specifically under TEDS Rule 3.1, however, all strip searches, x-ray

searches, body cavity searches, and monitored bowel movements (MBM) must be recorded in the appropriate electronic system(s) of record.

25. Plaintiff alleges specifically under TEDS Rule 3.1, the report must contain the reason for the search, results of the search, a description of any contraband recovered, who conducted the search, and who authorized the search.

26. Plaintiff alleges specifically under TEDS Rule 3.6, an immediate pat-down or Terry frisk is an external search necessary to ensure officer safety but, not for the purpose of checking for contraband.

27. Plaintiff alleges specifically under TEDS Rule 3.7, a strip search requires a person to remove or arrange some or all clothing to permit a visual inspection of the person's breasts, buttocks, or genitalia related to searches for contraband.

28. Plaintiff alleges specifically under TEDS Rule 3.7, Officers/Agents must obtain supervisory approval authorized by the operational office's policies and procedures before conducting a strip search.

29. Plaintiff alleges specifically under TEDs Rule 3.7, all strip searches, the reason for the search, and the authorizing supervisor must be documented in the appropriate electronic system(s) of record.

30. Plaintiff alleges specifically under TEDS Rule 3.8, a body cavity search is any internal search consisting of the visual or physical intrusion into the rectal or vaginal cavity.

31. Plaintiff alleges specifically under TEDS Rule 3.8, Officers/Agents are PROHIBITED from conducting physically intrusive body cavity searches.

32. Plaintiff alleges specifically under TEDS Rule 3.8, this type of body cavity search should be conducted under the most exceptional circumstances, and only by medical practitioners at

a medical facility.

33.     Plaintiff alleges specifically under TEDS Rule 3.8, body cavity searches will be conducted only after being approved by a supervisor authorized by the operational office's policies and procedures and after obtaining consent or a search warrant.

34.     Plaintiff alleges specifically TEDS Rule 3.8, all body cavity searches, the reason for the search, and the authorizing supervisor must be documented in the appropriate electronic system(s) of records.

35.     Plaintiff alleges specifically TEDS Rule 3.8, in the case of more physically intrusive body cavity searches, the name of the medical facility where the search was performed must also be documented in the appropriate electronic system(s) of record.

36.     Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ created and maintains a checkpoint for U.S. Citizens at the John F. Kennedy Airport Port of Entry into the United States.

37.     Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ unlawfully use 'race' as an impermissible factor to seize and search U.S. Citizens in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

38.     Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ unlawfully use 'random searches' as an impermissible factor to seize and search U.S. Citizens in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United

States Constitution.

39.     Plaintiff alleges that 'random searches' are in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

40.     Plaintiff alleges that on or about November 27, 2016, she passed through the checkpoint for U.S. Citizens at the John F. Kennedy Airport Port of Entry into the United States maintained by defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ.

41.     Plaintiff alleges while passing through the checkpoint, defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ subjected her to a 'random' stop using 'race' as an impermissible factor violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

42.     Plaintiff alleges defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ subjected her to a 'random' stop using 'race' as an impermissible factor in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

43.     Plaintiff alleges defendants' UNITED STATES OF AMERICA and UNITED STATES CUSTOMS AND BORDER PROTECTION and its employees carry-out these unlawful 'random' stops using 'race' as an impermissible factor throughout the United States especially against females and persons of color.

44.     Plaintiff alleges although she carried no drugs or violated any laws, defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ subjected her to an unlawful 'body

cavity search' in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

45.     Plaintiff alleges while retrieving her luggage inside of Terminal 4, defendants' PARKER and MUNOZ approached her for a 'random search.'

46.     Plaintiff alleges this isn't the first time she's been subjected to a 'random search.'

47.     Plaintiff alleges defendants' PARKER and MUNOZ ordered her to follow them to a secured area of Terminal 4.

48.     Plaintiff alleges prior to going to the secure area of Terminal 4, defendants' PARKER and MUNOZ'S supervisor interacted with her.

49.     Plaintiff alleges defendants' PARKER and MUNOZ'S supervisor asked her, "Why do you travel so much?"

50.     Plaintiff responded, "I'm a school counselor and I travel during the holidays."

51.     Plaintiff alleges defendants' PARKER and MUNOZ'S supervisor said, "Don't you think you're spending too much money traveling?"

52.     Plaintiff responded, "I travel when I can."

53.     Plaintiff then followed defendants' PARKER and MUNOZ into the secure area of Terminal 4.

54.     Plaintiff alleges while searching her luggage, defendant PARKER asked her if she had a tampon inside of her vagina or maxi pad.

55.     Plaintiff responded, "No."

56.     Plaintiff alleges she was afraid of defendants' PARKER and MUNOZ.

57.     Plaintiff alleges defendant MUNOZ stood nearby with her hand placed on her firearm.

58.     Plaintiff alleges defendants' PARKER and MUNOZ ordered her to place her hands against the wall and spread her legs.

59.     Plaintiff alleges defendant PARKER began touching her body from head to toe.

60.     Plaintiff alleges defendant PARKER did not articulate why she was being searched although she violated no laws.

61.     Plaintiff alleges defendant MUNOZ stood nearby with her hand on her firearm.

62.     Plaintiff alleges shortly thereafter defendants' PARKER and MUNOZ ordered her to squat in front of them in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

63.     Plaintiff alleges defendant MUNOZ ordered her to hold her hands up higher above her head and spread her legs wider.

64.     Plaintiff alleges defendant MUNOZ did not articulate why she was being treated in this manner although she violated no laws.

65.     Plaintiff alleges defendant PARKER then physically squeezed her breasts hard.

66.     Plaintiff alleges defendant PARKER then placed her right hand into her pants 'forcibly' inserting four (4) gloved fingers into plaintiff's vagina.

67.     Plaintiff alleges defendant PARKER then swiped her hand between both buttocks opening them for viewing.

68.     Plaintiff alleges defendant PARKER and MUNOZ'S actions are in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, and the Fourth and Fifth Amendments of the United States Constitution.

69.     Plaintiff while defendants' PARKER and MUNOZ subjected her to this conduct, she felt violated, shocked and afraid.

70.     Plaintiff alleges sometime later defendants' PARKER and MUNOZ'S supervisor entered the secure area.

71.     Plaintiff alleges defendants' PARKER and MUNOZ's supervisor told her paraphrase "This was a 'random search' and because you frequently travel, you may be subjected to another 'random search.' We're the federal government and we have the right to search you."

72.     Plaintiff alleges defendants' PARKER and MUNOZ'S supervisor's comments are in violation of TEDS Rule 1.4, 1.8, 3.1, 3.6 – 3.8, the Fourth and Fifth Amendments of the United States Constitution.

73.     Plaintiff alleges shortly thereafter, she and her father traveled to the North Shore Long Island Jewish – Syosset to receive medical treatment.

74.     Plaintiff alleges the hospital attempted to prepare a Vitullo Kit (Rape Kit) but, she was too traumatized for the examination.

75.     Plaintiff alleges the hospital then performed an external examination of her body including the breasts, vagina and buttocks.

76.     Plaintiff alleges the hospital notified the Port Authority of New York/New Jersey Police Department (PAPD).

77.     Plaintiff alleges hours later, PAPD Detective Albert Corradina, Criminal Investigations Bureau responded to the hospital.

78.     Plaintiff alleges shortly thereafter, PAPD Detective Corradina prepared a criminal complaint and filed it, Case No.: 16 K 75162.

79.     Plaintiff alleges shortly thereafter, the hospital discharged her referring her to a rape counseling service.

80.     Plaintiff alleges the rape counselor worked with her for approximately 10 months

referring her to a psychologist or psychiatrist to treat her anxieties.

81.    Plaintiff alleges shortly thereafter, she met with the Queens District Attorney's Office but, they failed to file criminal charges against defendants' JOHN DOES 1-3; PARKER and MUNOZ.

82.    Plaintiff alleges defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ'S actions caused her to sustain extreme emotional distress, substantial pain about the body, contusions to her breasts, discomfort inside of her vaginal cavity and buttocks.

83.    Plaintiff alleges defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ'S actions caused to become celibate.

84.    Plaintiff alleges defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ'S actions caused to suffer intermittent panic attacks, anxieties, fits of crying, etc., that are enhanced while traveling through ports of entries maintained by defendants' UNITED STATES OF AMERICA and UNITED STATES CUSTOMS AND BORDER PROTECTION.

## VIOLATIONS AND CLAIMS ALLEGED

### COUNT I
### VIOLATION OF THE FOURTH AMENDMENT
### ILLEGAL SEIZURE OF THE PERSON
### IN VIOLATION OF BIVENS

85.    Plaintiff re-alleges Paragraphs 1 through 84 and incorporates them by reference as Paragraphs 1 through 84 of Count I of this Complaint.

86.    Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ

acted under the color of federal law to deprive her right to be free from unreasonable governmental intrusion by seizing her without an articulable legal basis that she was committing a crime, in violation of the Fourth Amendment of the United States Constitution.

87.     Plaintiff alleges that this cause of action is brought pursuant to <u>Bivens v. Six Unknown Agents,</u> 403 U.S. 388 (1971).

**COUNT II**
**VIOLATION OF THE FOURTH AMENDMENT**
**ILLEGAL SEARCH OF THE PERSON**
**IN VIOLATION OF BIVENS**

88.     Plaintiff re-alleges Paragraphs 1 through 87 and incorporates them by reference as Paragraphs 1 through 87 of Count II of this Complaint.

89.     Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ acted under the color of federal law to deprive her right to be free from unreasonable governmental intrusion by searching her without an articulable legal basis that she was committing a crime, in violation of the Fourth Amendment of the United States Constitution.

90.     Plaintiff alleges that this cause of action is brought pursuant to <u>Bivens v. Six Unknown Agents,</u> 403 U.S. 388 (1971).

**COUNT III**
**VIOLATION OF THE FIFTH AMENDMENT**
**PROCEDURAL DUE PROCESS**
**IN VIOLATION OF BIVENS**

91.     Plaintiff re-alleges Paragraphs 1 through 90 and incorporates them by reference as Paragraphs 1 through 90 of Count III of this Complaint.

92.     Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ

acted under the color of federal law to deprive her right to procedural due process by acting in a manner that 'shocks the conscience' in violation of the Fifth Amendment of the United States Constitution.

93.     Plaintiff alleges that this cause of action is brought pursuant to <u>Bivens v. Six Unknown Agents,</u> 403 U.S. 388 (1971).

**COUNT IV**
**VIOLATION OF THE FIFTH AMENDMENT**
**SUBSTANTIVE DUE PROCESS**
**IN VIOLATION OF BIVENS**

94.     Plaintiff re-alleges Paragraphs 1 through 93 and incorporates them by reference as Paragraphs 1 through 93 of Count IV of this Complaint.

95.     Plaintiff alleges that defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ acted under the color of federal law to deprive her right to substantive due process by acting in a manner that 'shocks the conscience' in violation of the Fifth Amendment of the United States Constitution.

96.     Plaintiff alleges that this cause of action is brought pursuant to <u>Bivens v. Six Unknown Agents,</u> 403 U.S. 388 (1971).

**<u>JURY TRIAL</u>**

97.     Plaintiff demands a trial by jury of all issues in this action that are so triable.

**<u>PRAYER FOR RELIEF</u>**

Wherefore, plaintiff demands compensatory and punitive damages from defendants' UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; JOHN DOES 1-3; PARKER and MUNOZ jointly and severally, in an amount of $35 million dollars plus available statutory remedies, both legal and equitable, and interests and

costs.

Dated:  March 28, 2018
New York, N.Y.

Respectfully submitted,

By: _____ ,
Eric Sanders

Eric Sanders, Esq.
**THE SANDERS FIRM, P.C.**
30 Wall Street, 8th Floor
New York, N.Y. 10005
(212) 652-2782 (Business Telephone)
(212) 652-2783 (Facsimile)

Website: http://www.thesandersfirmpc.com

**EXHIBIT 1**



# U.S. Customs and Border Protection

## National Standards on Transport, Escort, Detention, and Search

### October 2015



U.S. Customs and Border Protection

# TABLE OF CONTENTS

FOREWORD FROM THE COMMISSIONER ... 3

AUTHORITIES / REFERENCES ............................. 3

1.0 GENERAL STANDARDS .................................. 4
    1.1 Safety During CBP Operations ........................ 4
    1.2 Integrity and Professionalism ......................... 4
    1.3 Zero Tolerance Policy Related to Sexual
        Abuse ................................................................. 4
    1.4 Non-Discrimination Policy ............................. 4
    1.5 Religious Sensitivity ....................................... 4
    1.6 Treatment of Juveniles ................................... 4
    1.7 Reasonable Accommodations and
        Language Access ............................................. 4
    1.8 Duration of Detention ..................................... 4
    1.9 Family Unity ..................................................... 4

2.0 TRANSPORT AND ESCORT
    STANDARDS .................................................... 5
    2.1 Vehicle Standards ............................................ 5
    2.2 Use of Restraints ............................................. 5
    2.3 Transport Communication ............................. 5
    2.4 Transport and Escort Assessment ................ 5
    2.5 Transporting and Escorting Officer/Agent
        Responsibilities ............................................... 5
    2.6 Ground Transportation and Escort
        Standards ......................................................... 6
    2.7 Commercial Air Transportation ................... 6
    2.8 Medical Precautions ....................................... 6
    2.9 Emergency Situations during Transport ..... 7
    2.10 Transfer of Detainee Documents and
        Medication ....................................................... 8

3.0 SEARCHES OF INDIVIDUALS ..................... 9
    3.1 Requirements ................................................... 9
    3.2 Use of Restraints ............................................. 9
    3.3 Communication ................................................ 9
    3.4 Gender of Searching Officer/Agent ............. 9
    3.5 Medical Emergencies ..................................... 9
    3.6 Pat-Down Search .......................................... 10
    3.7 Strip Search .................................................... 10
    3.8 Body Cavity Search ....................................... 11
    3.9 Medical X-Rays .............................................. 11
    3.10 Monitored Bowel Movement (MBM)
        Search ............................................................. 12
    3.11 Medical Treatment and Authority at a
        Medical Facility ............................................ 13

4.0 SECURE DETENTION STANDARDS ........ 14
    4.1 Duration of Detention ................................... 14
    4.2 At-Risk Detainee Determination
        Process ........................................................... 14
    4.3 General Detention Procedures ..................... 14
    4.4 Restraints Procedures ................................... 15
    4.5 Electronic System(s) of Record ................... 15
    4.6 Hold Room Monitoring ................................ 16
    4.7 Hold Room Standards ................................... 16
    4.8 Consular Contact and List of Legal Service
        Providers ........................................................ 16
    4.9 Telephones ...................................................... 16
    4.10 Medical .......................................................... 17
    4.11 Hygiene .......................................................... 17
    4.12 Bedding .......................................................... 17
    4.13 Food and Beverage ...................................... 18
    4.14 Drinking Water ............................................ 18
    4.15 Restroom Facilities ...................................... 18
    4.16 Open Area Security ...................................... 18

5.0 AT-RISK POPULATIONS ............................ 19
    5.1 General ............................................................ 19
    5.2 UAC Screenings ............................................ 19
    5.3 Documentation .............................................. 19
    5.4 Transport ........................................................ 20
    5.5 Search ............................................................. 20
    5.6 Detention ........................................................ 22
    5.7 Use of Restraints ........................................... 23

6.0 SEXUAL ABUSE VICTIMIZATION ........... 24

7.0 PERSONAL PROPERTY ............................... 26
    7.1 General ............................................................ 26
    7.2 Processing and Storage of Detainees'
        Personal Property ......................................... 26
    7.3 Notice to Detainees ...................................... 27
    7.4 Possessions Kept on the Detainee .............. 27
    7.5 Medications .................................................... 27
    7.6 Identification Documents ............................ 27

8.0 DEFINITIONS ................................................. 28

# FOREWORD FROM THE COMMISSIONER

*I am announcing the implementation of an agency-wide policy that sets forth the first nationwide standards which govern CBP's interaction with detained individuals.  This policy continues our commitment to the safety, security and care of those in our custody. The policy, titled U.S. Customs and Border Protection (CBP) National Standards on Transport, Escort, Detention, and Search (TEDS), is the result of collaborative work among various offices.*

*The new policy document is grounded firmly in the experience and policies of the Office of Field Operations and the United States Border Patrol. It incorporates best practices developed in the field, and it reflects key legal and regulatory requirements. In addition to transport, escort, detention and search provisions, TEDS also includes requirements related to: sexual abuse and assault prevention and response; care of at-risk individuals in custody; and personal property.*

*I commend the many offices across CBP and DHS who worked together to produce this important policy document.*

*R. Gil Kerlikowske*

Commissioner
U.S. Customs and Border Protection

# AUTHORITIES / REFERENCES

**Authorities/References (including, but not limited to, the following):** *19 United States Code (USC) §§ 482, 1461, 1581, 1582, 1589a; Title 8 Code of Federal Regulations (CFR) Parts 232, 235, 236, and 287; 6 CFR Part 115; 79 FR 13100 (Standards To Prevent, Detect, and Respond to Sexual Abuse and Assault in Confinement Facilities); The Immigration and Nationality Act (INA); Personal Search Handbook, CIS HB 3300-04B revised July 2004; Use of Force Policy, Guidelines and Procedures Handbook, HB 4500-01C, revised May 2014; Motor Vehicle Management Handbook, HB 5200-14B, revised June 2014; Occupational Safety and Health Handbook, HB 5200-08B, revised September 2012; Secure Detention, Transport and Escort Procedures at Ports of Entry, 3340-030B, August 8, 2008; The Law of Arrest, Search, and Seizure Manual, M-69; Enforcement Standards — Body Searches, May 28, 1997; Hold Rooms and Short Term Custody, OBP 50/10.2-P; CBP Policy on Nondiscrimination in Law Enforcement Activities and all other Administered Programs, February 6, 2014; CBP Zero-Tolerance Policy, March 11, 2015.*

# 1.0 GENERAL STANDARDS

## 1.1 SAFETY DURING CBP OPERATIONS

The safety of CBP employees, detainees, and the public is paramount during all aspects of CBP operations.

## 1.2 INTEGRITY AND PROFESSIONALISM

CBP employees must speak and act with the utmost integrity and professionalism. CBP employees must conduct themselves in a manner that reflects positively on CBP at all times.

## 1.3 ZERO TOLERANCE POLICY RELATED TO SEXUAL ABUSE

CBP has a zero tolerance policy prohibiting all forms of sexual abuse of individuals in CBP custody, including in detention facilities, during transport, and during processing.

## 1.4 NON-DISCRIMINATION POLICY

CBP employees must treat all individuals with dignity and respect. CBP employees will perform their duties in a non-discriminatory manner, with respect to all forms of protected status under federal law, regulation, Executive Order, or policy, with full respect for individual rights including equal protection under the law, due process, freedom of speech, and religion, freedom from excessive force, and freedom from unreasonable searches and seizures.

## 1.5 RELIGIOUS SENSITIVITY

Without compromising officer/agent safety, officers/agents should remain cognizant of an individual's religious beliefs while accomplishing an enforcement action in a dignified and respectful manner.

## 1.6 TREATMENT OF JUVENILES

Officers/Agents will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation. Officers/Agents should recognize that juveniles experience situations differently than adults (see Section 5.0).

## 1.7 REASONABLE ACCOMMODATIONS AND LANGUAGE ACCESS

Reasonable accommodations must be made for a detainee's known or reported mental, physical and/or other special needs consistent with safety, and security requirements. All instructions and relevant information must be communicated to the detainee in a language or manner the detainee can comprehend.

## 1.8 DURATION OF DETENTION

Every effort must be made to promptly transfer, transport, process, release, or repatriate detainees as appropriate according to each operational office's policies and procedures, and as operationally feasible.

## 1.9 FAMILY UNITY

CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation.

# 2.0 TRANSPORT AND ESCORT STANDARDS

For transport and escort standards related to at-risk detainees, see Section 5.4. The at-risk determination process can be found in Section 4.2.

## 2.1 VEHICLE STANDARDS

*Safety and Compliance:* CBP vehicles used for transporting detainees must be properly equipped, maintained and operated. Additionally, these vehicles must comply with safety inspection requirements in accordance with applicable federal and state law.

*Vehicle Interiors:* CBP vehicle interiors must be kept as clean as operationally feasible.

*Search for Weapons, Dangerous Items and Contraband:* All CBP vehicles, including the confinement space and the immediate area surrounding the confinement space, must be searched prior to and following each transport to ensure that no weapons, dangerous items (including items that could be used for suicide), or contraband are present.

## 2.2 USE OF RESTRAINTS

*General:* The use of restraints on detainees during transport must be in a manner that is safe, secure, humane, and professional. It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures. At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

*Testing Restraints:* Officers/Agents must regularly test handcuffs, leg restraints, belly chains, or other restraining devices to ensure that they are functioning properly.

## 2.3 TRANSPORT COMMUNICATION

Officers/Agents transporting detainees must follow established communication procedures especially as they relate to juveniles, females, and other at-risk populations.

## 2.4 TRANSPORT AND ESCORT ASSESSMENT

*Assessment:* Prior to transport or escort, officers/agents must conduct a detainee transport assessment to evaluate each detainee's safety, known or reported medical or mental health issues and level of risk to themselves, other detainees, and staff based on the information available at the time of the assessment. Officers/Agents assigned transport or escort duties must be informed of any known adverse assessment pertaining to a detainee being transported or escorted.

*At-Risk Indicator:* If a transport assessment indicates that a detainee could be an at-risk detainee (see Section 4.2), officers/agents must exercise particular care during transport and escort.

## 2.5 TRANSPORTING AND ESCORTING OFFICER/AGENT RESPONSIBILITIES

*Compliance:* Officers/Agents must comply with all operational office's policies and procedures pertaining to the use of government vehicles as articulated in the most recent Motor Vehicle Management Handbook, and must operate vehicles in accordance with all appropriate traffic laws and regulations.

*Pat-down Search:* No detainee will be transported or escorted without the officer/agent conducting a pat-down search of the detainee, except when exigent circumstances pose a safety hazard or danger to the officer/agent, detainee, or public.

*Vehicle Security:* Officers/Agents must secure the vehicle before leaving it unattended. This includes removing the keys from the ignition.

*Unattended Detainees:* Officers/Agents must not leave detainees unattended in a vehicle.

*Vehicle Inspection:* At the beginning and end of each shift, a physical inspection of the vehicle's confinement area is required.

*Authorized Attire:* Officers/Agents must follow the operational office's policies and procedures related to attire. Badges and nameplates should be worn on the outermost uniform garment and be visible to the public when practicable.

*Medical Issues:* Officers/Agents must be alert to

medical symptoms such as coughing, fever, diarrhea, rashes or emaciation, in addition to obvious wounds, injuries, cuts, bruising or bleeding, heat related injury or illness, and dehydration.  Any observed or reported injury or illness must be reported, and appropriate medical care must be provided or sought in a timely manner.

*Detainee Distress:* In addition to verbal communication, officers/agents must be alert to non-verbal cues exhibited by detainees that might indicate that the detainee is in mental or physical distress.  This might include expressions of suicidal thoughts, hallucinations, or other signs of disorientation.

## 2.6 Ground Transportation and Escort Standards

*Transport Determination:* In determining the number of officers/agents and vehicles that are required for a particular transport, the transport assessment, duration of travel, destination, and other appropriate factors must be considered.

*Unsecured Vehicles:* Using an unsecured vehicle to transport detainees should be avoided; however, operational circumstances may require officers/agents to use an unsecured vehicle to transport a detainee.

*Gender of Transporting/Escorting Officer/Agent:* Whenever operationally feasible, transport/escort must be conducted by two officers/agents with at least one being of the same gender or gender identity as the detainee(s).

*Criminals:* Whenever operationally feasible, detainees who are in CBP custody for a non-immigration criminal offense, or who are known to have a violent criminal history, must be separated from other detainees when being transported.  Exceptions may be made on a case-by-case basis based on family unity.

*Personal Property Access:* No baggage, luggage, parcel, or personal property shall be accessible to detainees during transport unless the items have been thoroughly searched by officers/agents and determined to present no risk to officers/agents or

any detainee.  When exigent circumstances pose a safety hazard or danger to an officer/agent, detainee, or member of the public that require a delay in searching personal property, a search must be conducted as soon as practicable.

*Seatbelts:* All CBP employees in all seats of any motor vehicle used on official business must have their seatbelt properly fastened at all times when the vehicle is in motion.  This includes CBP-owned and leased vehicles and rental vehicles operated by CBP employees while in temporary duty or travel status.  Detainees should always be in seatbelts if available in the vehicle.

*Safety and Security:* Officers/Agents must maintain a clear view of immediate confinement areas to the extent permitted by the transport vehicle, and remain alert to behavior that could jeopardize the safety and security of the officers/agents, detainees, and the public.  In the event a transport vehicle contains more than one officer/agent, the secondary officer/agent is responsible for detainee oversight during transport.

*Meals:* Meals and snacks will be made available during any transfer that exceeds six hours for juveniles and eight hours for adults.

*Temperature:* Officers/Agents should maintain vehicle temperature within a reasonable and comfortable range for both detainees and officers/agents.  Under no circumstances will officers/agents use temperature controls in a punitive manner.

## 2.7 Commercial Air Transportation

Prior to transporting detainees, officers/agents must conduct an air transportation assessment.  The evaluation must include the detainees' potential risk for flight or escape, behavior, medical condition, and if a request for accompanying medical personnel should be made, based on the information available at the time of the assessment.

## 2.8 Medical Precautions

If officers/agents suspect that a detainee has an observed or reported medical condition, such as a contagious disease, appropriate protective precautions must be taken and any required

notifications made according to the operational office's policies and procedures.

In cases where a detainee expresses, either verbally or symptomatically, a desire to harm themselves, officers/agents should maintain a line of sight with the individual at all times.

## 2.9 EMERGENCY SITUATIONS DURING TRANSPORT

Operational offices will establish a written policy to address emergency situations. This policy must direct local offices, ports or stations to establish written procedures for transporting staff to follow in an en-route emergency and proper documentation procedures after such an emergency.

It is understood that based on the totality of the circumstances, different officers/agents may have different responses to the same situation, any of which may be both reasonable and necessary. Actions taken during an emergency situation must reflect the totality of the circumstances surrounding the situation, including the presence of imminent danger to the officers/agents or others.

At a minimum these policies and procedures must include the following situations and actions:

**Imminent Loss of Life:** If an emergency situation is life-threatening, officers/agents will take immediate action to address the situation and make appropriate notifications.

**Unconscious or Unresponsive Detainee:** If a detainee becomes unconscious or unresponsive during transport, officers/agents will immediately request emergency medical services, and render aid. If a detainee is pronounced dead by qualified medical personnel, officers/agents must make appropriate notifications.

**Illness or Injury:** If a detainee becomes ill or injured prior to boarding the vehicle or while in transit, officers/agents must alert the receiving office. If deemed appropriate, emergency medical services must be notified.

**External Threat:** Officers/Agents should request immediate assistance and take appropriate action to mitigate the situation. If the vehicle is incapacitated, officers/agents will do everything possible to protect the safety of everyone in the vehicle.

**Escape:** In the event of an escape, pursuit of the escapee by officers/agents should only be conducted when it does not jeopardize the security of the remaining detainees or members of the public. Officers/Agents must notify appropriate law enforcement agencies with a description of the subject and known biographic data and make appropriate notifications.

**Fire:** In case of a vehicle fire, officers/agents must immediately stop the vehicle and evacuate the detainees in a safe and orderly fashion. Officers/Agents are responsible for maintaining accountability of all detainees and requesting assistance from the local fire department and law enforcement agency.

**Natural Disasters:** In the event of a natural disaster, officers/agents must contact the appropriate authorities to assess current conditions along the planned route. If driving conditions are unlikely to improve, transport must be delayed until the emergency has passed. If officers/agents are in transit and a natural disaster occurs, officers/agents must stop the vehicle in a safe area, take appropriate actions for the safety and security of all employees and detainees, make appropriate notifications, and await further instructions. Should it become necessary to exit the vehicle, the detainees must be maintained in a safe area. Officers/Agents must maintain a heightened state of alertness for the duration of the emergency. When the emergency has passed, the officers/agents must return all detainees to the vehicle while ensuring accountability of all detainees.

**Traffic Accident:** In the event of a traffic accident involving the transport vehicle, officers/agents must secure the area, obtain medical assistance for anyone who may be injured, and request assistance from the appropriate law enforcement agency. Officers/Agents must make appropriate notifications.

**Vehicle Failure:** If a vehicle develops serious mechanical problems en route, officers/agents will take appropriate actions for the safety and security of all detainees and make appropriate notifications.

***Disturbances by Detainees:*** If a detainee becomes violent or creates a disturbance that affects their or another individual's safety and security, officers/agents will take appropriate action to de-escalate the situation, and make appropriate notifications.

## 2.10 TRANSFER OF DETAINEE DOCUMENTS AND MEDICATION

When transferring a detainee, officers/agents must ensure that all appropriate documentation accompanies the detainee including all appropriate medical records and medication as required by the operational office's policies and procedures.

# 3.0 SEARCHES OF INDIVIDUALS

For search standards related to at-risk detainees, see Section 5.5. The at-risk determination process can be found in Section 4.2.

## 3.1 REQUIREMENTS

*Legal Authority and Standards:* All searches must be conducted under the appropriate legal authority and standards. Officers/Agents must be diligent in their efforts to protect a detainee's legal rights and treat detainees with respect, dignity, and an appropriate level of privacy.

*Decision to Search:* Officers/Agents must consider the totality of the circumstances and articulable factors when making a decision to search.

*Privacy:* Recognizing the potential intrusiveness of these searches on an individual's sense of privacy, searches must be conducted only with the proper legal authority and justification, with due recognition and deference for the human dignity of those being searched, and in accordance with the operational office's policies and procedures.

*Conduct of Search:* Searches must be conducted in a professional, thorough, and reasonable manner, consistent with the type of search required. In no case should any complaint, threat of complaint, or physical resistance result in a detainee not being searched, or being searched less thoroughly than is warranted by the circumstances.

*Documentation:* Each operational office determines search documentation requirements. However, all strip searches, X-ray searches, body cavity searches, and monitored bowel movements (MBM) must be recorded in the appropriate electronic system(s) of record. The report must contain the reason for the search, results of the search, a description of any contraband recovered, who conducted the search, and who authorized the search.

## 3.2 USE OF RESTRAINTS

*General:* The use of restraints on detainees during the search process must be in a manner that is safe, secure, humane, and professional. It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures. At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

*Testing Restraints:* Officers/Agents must regularly test handcuffs, leg restraints, belly chains, or other restraining devices to ensure that they are functioning properly.

## 3.3 COMMUNICATION

All search instructions must be communicated to the detainee in a language or manner the detainee can comprehend. For safety reasons, an explanation of an immediate pat-down for weapons or dangerous objects may be conducted after the search. Officers/Agents will explain the search process, in general terms, as the search progresses.

## 3.4 GENDER OF SEARCHING OFFICER/AGENT

Whenever operationally feasible, officers/agents conducting a search or that are present at a medical examination, must be of the same gender, gender identity, or declared gender as the detainee being searched.

Cross-gender strip searches or cross-gender visual body cavity searches must not be conducted except in exigent circumstances including consideration of officer safety, or when performed by medical practitioners. When officers/agents of the opposite gender perform a strip search or are present at a medical examination such as a body cavity search, MBM, or X-ray, it is mandatory that two officers/agents be present.

## 3.5 MEDICAL EMERGENCIES

Officers/Agents have a responsibility to safeguard detainees during a search. If there is any observed or reported indication that the detainee is injured or in any way may require medical treatment, appropriate medical care must be provided or sought in a timely manner.

## 3.6 PAT-DOWN SEARCH

***Immediate Pat-down/Terry Frisk:*** An immediate pat-down or *Terry* frisk is an external search necessary to ensure officer safety.  The scope of an immediate pat-down must be limited to those areas on a detainee where an officer/agent suspects a weapon or dangerous object may be concealed.  There may be cases where it is necessary to search the entire detainee to ensure a weapon and/or dangerous object is not present.  This may include the removal of a detainee's shoes to ensure there is no weapon present, but not the removal for the purpose of checking for merchandise (including contraband).

***Search Incident to Arrest:*** An external search incident to a lawful arrest includes a search for both dangerous weapons and evidence.  The facts and circumstances surrounding an arrest will dictate the degree of intrusiveness necessary to properly conduct the search.

***Non-search Related Examinations:*** For the purposes of this policy, examinations of detainees conducted by officers/agents for the documentation of illness, injury, tattoos, or other identifying markings do not constitute a search.  This includes examinations that involve the manipulation of or removal of a detainee's clothes or garments except to the extent that such manipulation reveals breasts, buttocks, or genitalia.

## 3.7 STRIP SEARCH

***General:*** A strip search requires a person to remove or arrange some or all clothing to permit a visual inspection of the person's breasts, buttocks, or genitalia related to searches for contraband.

***Supervisory Approval:*** Officers/Agents must obtain supervisory approval authorized by the operational office's policies and procedures before conducting a strip search. (Telephonic approval is permitted).

***Strip Search Documentation:*** All strip searches, the reason for the search, and the authorizing supervisor must be documented in the appropriate electronic system(s) of record.

***Privacy:*** All strip searches must be conducted in a manner and location that provides the greatest degree of privacy possible.  The number of officers/

agents present must be limited to the minimum number needed to conduct and witness the search.

***Strip Search Conduct:*** Generally during a strip search, the detainee being searched should remove their own clothing unless they refuse to cooperate.  Officers/Agents should not touch the detainee during a strip search unless the detainee refuses to remove any article of clothing or otherwise impedes the officer/agent in the performance of their duties.  In those rare instances where an officer/agent is required to touch a detainee or remove clothing, the circumstances must be documented.

***Communication:*** Officers/Agents must ensure that the explanation of the search process is in a language or manner the detainee comprehends.

***Search of Clothing:*** Each article of clothing that is removed must be thoroughly searched by the officer/agent.

***Search of Prosthetic Devices:*** Removal of prosthetic devices such as an artificial limb is considered to be part of a strip search.  If there is reasonable suspicion that contraband may be concealed within the device, the detainee being searched should remove the device if they can do so without medical assistance.  If they cannot, or refuse to do so, the officer/agent must seek the assistance of medical personnel.

***Search of Casts:*** Removal of a cast is considered to be part of a strip search.  If there is reasonable suspicion that contraband may be concealed within a cast, officers/agents must take the detainee to a medical facility to have the cast X-rayed and/or removed.  Under no circumstances will a cast be probed or removed by an officer/agent while it is attached to a detainee's body.

***Search of Splints:*** Splints that are not able to be removed by the detainee should be removed by a medical practitioner such as a credentialed EMT.  If there is any concern for the safety of the detainee, this should be done at a medical facility.

***Objects in the Rectal Cavity:*** Officers/Agents should not ask a detainee to remove an object from the rectal cavity or attempt to remove it themselves.  If there is reasonable suspicion that the detainee is carrying contraband in the rectal cavity, officers/

agents must consult and receive approval from a supervisor, and immediately proceed to a medical facility for a body cavity search conducted by a medical practitioner.  Further action must be consistent with the operational office's policies and procedures.

***Objects in the Vaginal Cavity:*** If an object in the vaginal cavity is detected and it is reasonably suspected that the object may contain contraband, officers/agents must stop the search and consult a supervisor.  If the supervisor concurs that reasonable suspicion exists, the supervisor may authorize the officer/agent to ask the detainee to voluntarily remove the object.  If the detainee refuses to voluntarily remove the object, officers/agents must consult and receive approval from a supervisor, and immediately proceed to a medical facility for a body cavity search conducted by a medical practitioner. Further action must be consistent with the operational office's policies and procedures.

## 3.8 BODY CAVITY SEARCH

***General:*** A body cavity search is any internal search consisting of the visual or physical intrusion into the rectal or vaginal cavity.

***Medical Practitioner and Medical Facility Requirement:*** Officers/Agents are prohibited from conducting physically intrusive body cavity searches. This type of body cavity search should be conducted only under the most exceptional circumstances, and only by medical practitioners at a medical facility.

***Supervisory Approval for Body Cavity Searches:*** Body cavity searches will be conducted only after being approved by a supervisor authorized by the operational office's policies and procedures and after obtaining consent or a search warrant.  If a qualified medical practitioner determines that immediate action must be taken to protect the health of the detainee, such action is authorized. (Telephonic approval is permitted).

***Documentation of a Body Cavity Search:*** All body cavity searches, the reason for the search, the authorizing supervisor, and the outcome must be documented in the appropriate electronic system(s) of record.  In the case of more physically intrusive body cavity searches, the name of the medical

facility where the search was performed must also be documented in the appropriate electronic system (s) of record.

***Communication:*** Officers/Agents must ensure that the explanation of the search process is in a language or manner the detainee comprehends.

***Use of Restroom:*** When a detainee who is suspected of internally carrying contraband requests to use the restroom prior to being taken to a medical facility, the detainee will be escorted to a restroom without flushable toilet facilities.

***Prohibition on Observation:*** Only medical practitioners may observe a physically intrusive body cavity search.  Officers/Agents may be in the room only for the purposes of corroborating any evidence found and to provide safety and security.  Officers/Agents are prohibited from serving as a medical witness (standby).

***Negative Results Determination:*** When a medical practitioner has determined that foreign objects are not present via a body cavity search and that no further medical treatment is required, the detainee must be immediately transported back to the CBP facility, unless the CBP supervisor determines that additional actions should be taken.

***Inconclusive Results Determination:*** If a medical practitioner deems the body cavity search inconclusive, a decision must be made by the CBP supervisor after obtaining legal advice from CBP counsel to determine the next appropriate steps.

***Positive Results Determination:*** If a medical practitioner believes that the body cavity search indicates the presence of foreign objects, a CBP supervisor must be notified to approve the detention of the detainee for further medical treatment, consistent with the operational office's policies and procedures.

## 3.9 MEDICAL X-RAYS

***General:*** An X-ray search is an internal search consisting of the use of a medical X-ray by medical practitioners to determine the presence of contraband within the body.

***Supervisory Approval:*** An X-ray search will be conducted only after being approved by a supervisor

authorized by the operational office's policies and procedures and after obtaining consent or a search warrant.  If a qualified medical practitioner determines that immediate action must be taken to protect the health of the detainee, such action is authorized. (Telephonic approval is permitted).

***Documentation of an X-Ray Search:*** All x-ray searches, the reason for the search, the authorizing supervisor, the name of the medical facility, and the outcome must be documented in the appropriate electronic system(s) of record.

***Medical Practitioner and Medical Facility Requirement:*** Medical practitioners will conduct the X-ray search at a medical facility.  Officers/Agents are prohibited from conducting X-ray examinations or utilizing any CBP equipment to conduct an X-ray examination. Only qualified medical practitioners may read and interpret the X-ray.

***Communication:*** Officers/Agents must ensure that an overview of the X-ray process, including a request for consent, is in a language or manner the detainee comprehends.

***Consent:*** Consent to search must be freely and voluntarily given as it relates to X-rays before the X-ray is administered.  Involuntary X-ray searches require a court order.  Involuntary X-ray searches will be conducted only under the most extraordinary circumstances, and never on detainees who are pregnant or a detainee who refuses to have a pregnancy test after having been determined by medical personnel to require a pregnancy test.

***Pregnancy Test:*** When a detainee is taken to a medical facility for an X-ray search, medical personnel will determine if a pregnancy test is required prior to an X-ray.  If medical personnel determine a pregnancy test is necessary and the detainee refuses the pregnancy test, a decision to determine the next appropriate steps must be made by a CBP supervisor after obtaining legal advice from CBP counsel.

***Revocation of Consent:*** A detainee may revoke consent for an X-ray search at any time, even at the medical facility.  The revocation may be verbal or by actions.  If the detainee revokes consent, officers/agents must immediately inform the medical practitioner to stop the X-ray search based on the revocation of consent and notify their supervisor. Revocation of consent must be documented in the appropriate electronic system(s) of records.

***Negative Results Determination:*** When a medical practitioner has determined that foreign objects are not present in the body and that no further medical treatment is required, the detainee must be immediately transported back to the CBP facility, unless the CBP supervisor determines that additional actions should be taken.

***Inconclusive Results Determination:*** If a medical practitioner deems the X-ray inconclusive, a decision must be made by the CBP supervisor after obtaining legal advice from CBP counsel to determine the next appropriate steps.

***Positive Results Determination:*** If a medical practitioner believes that the X-ray indicates the presence of foreign objects, a CBP supervisor must be notified to approve the detention of the detainee for further medical treatment, consistent with the operational office's policies and procedures.

## 3.10 MONITORED BOWEL MOVEMENT (MBM) SEARCH

***General:*** An MBM search is an internal search consisting of detaining a suspect, under close observation, to permit time for a swallowed object to be expelled by the body through natural means. The MBM involves both an extended period of detention coupled with close observation of the detainee and inspection of all fecal material, and may be necessary where the detainee refuses to submit to an examination to confirm the existence of swallowed contraband or where such examination is not considered medically appropriate.  Prior to the detainee being transported to a medical facility, he or she may be placed in a CBP hold room or other designated area without flushable toilet facilities.

***Medical Supervision and Medical Facility Requirement:*** Because of the danger that internally swallowed or stuffed drug containers may rupture, the detainee must be taken to a medical facility as soon as possible and placed under medical supervision (with appropriate security) to minimize possible injury.  Officers/Agents are prohibited from conducting MBM.  MBM must not be conducted at CBP facilities.

**Supervisory Approval:** Officers/Agents must obtain supervisory approval authorized by the operational office's policies and procedures before a detainee undergoes an MBM. (Telephonic approval is permitted).

**Documentation of an MBM Search:** All MBM searches, the reason for the search, the authorizing supervisor, the name of the medical facility, and the outcome must be documented in the appropriate electronic system(s) of record.

**Communication:** Officers/Agents must ensure that an overview of the MBM process is in a language or manner the detainee comprehends.

## 3.11 MEDICAL TREATMENT AND AUTHORITY AT A MEDICAL FACILITY

**Medical Decision Making:** Once a detainee is at a medical facility, medical practitioners make all medical decisions which may include medical release or fitness for travel.  Officers/Agents have no authority over the detainee's medical treatment, but remain responsible for enforcement decisions regarding the detainee.

**Officer/Agent Medical Prohibition:** Except for assistance with lifesaving emergency medical care which they feel comfortable rendering and are trained to render, officers/agents will not administer medical techniques or medications, unless they are qualified emergency medical technicians or paramedics rendering care.

**Medical Treatment Protocols:** While medical treatment is based on the local standard of care and at the discretion of the medical practitioner, recommended medical treatment protocols from the DHS Chief Medical Officer are available.

3.0 SEARCHES OF INDIVIDUALS

# 4.0 SECURE DETENTION STANDARDS

For detention standards related to at-risk detainees, see Section 5.6. The at-risk determination process can be found in Section 4.2.

## 4.1 DURATION OF DETENTION

Detainees should generally not be held for longer than 72 hours in CBP hold rooms or holding facilities. Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible.

## 4.2 AT-RISK DETAINEE DETERMINATION PROCESS

Before placing any detainees together in a hold room or holding facility, officers/agents shall assess the information before them to determine if the detainee may be considered an at-risk detainee, or at risk of posing a threat to others. This assessment will include:

- Whether the detainee has or demonstrates a mental, physical, or developmental disability;
- Whether the detainee has an observed or reported serious physical/mental injury or illness;
- The age of the detainee;
- Whether the detainee is pregnant or nursing;
- The physical build and appearance of the detainee;
- The detainee's own stated concerns about his or her physical safety;
- Whether the detainee has self-identified as gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;
- Whether the detainee has self-identified as having previously experienced sexual victimization;
- The detainee's risk of being sexually abused by other detainees;
- Whether a detainee may be sexually abusive toward other detainees; and
- Whether the detainee has previously been incarcerated or detained (this should include the nature of the detainee's criminal or violent history, and/or gang affiliation, and whether the detainee has any convictions for sex offenses against an adult or child).

**Privacy:** Efforts should be taken to ensure that all assessments are conducted in a way that provides detainees the greatest level of privacy possible. All CBP facilities must implement appropriate controls on the dissemination of private and/or sensitive information provided by detainees under this section. Officers/Agents will disclose this information only to those personnel with a need to know according to the operational office's policies and procedures. If the information obtained under this section is maintained in a Privacy Act compliant system of records, the information may be disclosed pursuant to the routine uses identified in the applicable System of Records Notice.

## 4.3 GENERAL DETENTION PROCEDURES

**Medical Issues:** Upon a detainee's entry into any CBP hold room, officers/agents must ask detainees about, and visually inspect for any sign of injury, illness, or physical or mental health concerns and question the detainee about any prescription medications. Observed or reported injuries or illnesses should be communicated to a supervisor, documented in the appropriate electronic system(s) of record, and appropriate medical care should be provided or sought in a timely manner.

**Medical Precautions:** If officers/agents suspect that a detainee has an observed or reported medical condition, such as a contagious disease, appropriate protective precautions must be taken and any required notifications made according to the operational office's policies and procedures.

**Search:** Detainees must be searched for weapons and contraband prior to being placed in a CBP hold room.

**Gender of Searching Officer/Agent:** Whenever operationally feasible, officers/agents conducting a search or that are present at a medical examination must be of the same gender, gender identity, or declared gender as the detainee being searched. Cross-gender strip searches or cross-gender visual body cavity searches must not be conducted except in exigent circumstances including consideration of officer/agent safety, or when performed by medical practitioners.

**Safety and Security Reporting:** During shift change officers/agents must convey all known information of vulnerabilities, escape risks, criminal background or involvement, and/or violence to oncoming officers/agents.

**Gender Segregation:** Male and female adult detainees will be segregated at all times when in hold rooms. Particular care should be afforded to at-risk populations, including transgender and intersex detainees. Exceptions may be made on a case by case basis, based on family unity.

**Juvenile/Adult Segregation:** Detainees under the age of 18 years will not be held with adult detainees, unless the adult is an immediate relative or legal guardian responsible for the care and custody of the juvenile, and no other adult detainees are present in the area. Exceptions may be made on a case-by-case basis, based on family unity.

**Family Units:** Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow their operational office's policies and procedures and appropriate legal requirements. In circumstances where family units must be separated due to different immigration dispositions, such separation much be documented in the appropriate electronic system(s) of record.

**Evacuation Plan:** Every CBP facility will have an evacuation plan that is posted in the processing area. The supervisor is responsible for ensuring that all staff members are familiar with evacuation procedures.

## 4.4 RESTRAINTS PROCEDURES

**General:** The use of restraints on detainees during detention must be in a manner that is safe, secure, humane, and professional. It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures. Detainees who are restrained must be monitored at all times. At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

**Testing Restraints:** Officers/Agents must regularly test handcuffs, leg restraints, belly chains, or other restraining devices to ensure that they are functioning properly.

## 4.5 ELECTRONIC SYSTEM(S) OF RECORD

All custodial actions, notifications, and transports that occur after the detainee has been received into a CBP facility must be accurately recorded in the appropriate electronic system(s) of record as soon as practicable. The electronic system(s) of record must contain the information listed below:

　　Name of the person detained
　　Country of birth (COB)
　　Date of birth (DOB)
　　Date and time placed into a hold room or
　　　　unattended secure area
　　Date and time removed from a hold room or
　　　　unattended secure area
　　Reason detained
　　Officer's/Agent's name
　　Supervisor's name
　　Final disposition

Whenever possible, the electronic system(s) of record should also include any of the following that apply:

　　Personal belongings secured, receipted, and/or
　　　　returned
　　Screened for trafficking (yes/no)
　　Telephone use
　　Language services provided and language spoken
　　　　if other than English or Spanish (including
　　　　services provided to the hearing impaired)
　　Medical care requested/provided/declined
　　Detainee's receipt of list of legal services
　　　　providers
　　Bedding provided/declined
　　Meals provided/meals refused
　　Visual and/or verbal checks completed
　　Showers, if provided
　　Transporting agency, personnel identification, and
　　　　mode of transportation
　　Date/time departing the facility

In the event that the appropriate electronic system is inoperable, paper logs must be used until the electronic system is operational. Any information recorded on paper logs must be entered into the

appropriate electronic system(s) of record once the system is available.

## 4.6 HOLD ROOM MONITORING

*Supervision and Inspections:* Officers/Agents must closely supervise hold rooms when in use. Monitoring must occur in a regular and frequent manner.  In hold rooms with visual limitations, a physical check is required.  Direct supervision and control of detainees must be maintained at all facilities that do not have secure areas.

*Non-24 Hour Holding Facilities:* Prior to the closing of any hold room facility that does not operate on a 24 hour basis, a physical inspection of the hold room is required.

*Checks:* Officers/Agents will physically check hold rooms on a regular and frequent manner, according to each operational office's policies and procedures. Physical inspections must be recorded in the appropriate electronic system(s) of record as soon as practicable.

*Privacy:* Officers/Agents will enable detainees to shower (where showers are available), perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances or when such viewing is incidental to routine cell checks or is otherwise appropriate in connection with a medical examination or MBM under medical supervision.

*Officer/Agent Hold Room Entry:* Officers/Agents of the opposite gender will announce their presence when entering an area where detainees are likely to be showering, performing bodily functions, or changing clothing, except in exigent circumstances or when such viewing is incidental to routine cell checks.

*Use of Restrooms:* If restrooms are not available in the secure area, supervisors must ensure that an officer/agent is within visible or audible range of the secure area to allow detainees to access restrooms upon request.

*Voyeurism:* Officers/Agents must not engage in any act of voyeurism.

## 4.7 HOLD ROOM STANDARDS

*Capacity:* Every effort must be made to ensure that hold rooms house no more detainees than prescribed by the operational office's policies and procedures.  Capacity may only be exceeded with supervisory approval.  However, under no circumstances should the maximum occupancy rate, as set by the fire marshal, be exceeded.

*Hold Room Checks:* Regular hold room checks should be conducted and recorded to ensure proper occupancy levels, safety, hygiene, and the availability of drinking water.  Such checks should be recorded in the appropriate electronic systems of record as soon as practicable.

*Weapons and Tampering:* Hold rooms will be regularly inspected for evidence of tampering and must be cleared of all items that could be used to facilitate an escape, or as a weapon to do bodily harm to the detainee or others.

*Cleanliness:* All facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized.  Officers/Agents or detainees will not be expected nor required to perform such tasks.

*Use of Tobacco Products:* Use of tobacco products by detainees is strictly prohibited in hold rooms.

*Temperature Controls:* When it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents.  Under no circumstances will officers/agents use temperature controls in a punitive manner.

## 4.8 CONSULAR CONTACT AND LIST OF LEGAL SERVICE PROVIDERS

As appropriate, detainees must be advised of their right to consular access in a language or manner the detainee comprehends. If requested by a detainee, consular contact will be afforded as soon as operationally feasible.  Detainees referred for removal proceedings shall be provided with a list of legal service providers and their contact information.

## 4.9 TELEPHONES

Officers/Agents must grant detainees telephone access per the operational office's policies and procedures and may, at their discretion, grant telephone access to any detainee even if not required.  Detainees who wish to make other than a

local call must use a calling card or call collect. Unaccompanied Alien Children (UAC) must be offered use of a telephone.

## 4.10 MEDICAL

**Medical Emergencies:** Emergency medical services will be called immediately in the event of a medical emergency (e.g., heart attack, difficulty breathing) and the call will be documented in the appropriate electronic system(s) of record. Officers/Agents must notify the shift supervisor of all medical emergencies as soon as possible after contacting emergency services.

**Contagious Disease:** If an officer/agent suspects or a detainee reports that a detainee may have a contagious disease, the detainee should be separated whenever operationally feasible, and all other appropriate precautions must be taken and required notifications made, according to the operational office's policies and procedures.

**Medication:** Except for assistance with lifesaving emergency medical care which they feel comfortable rendering and are trained to render, officers/agents will not administer medical techniques, medications, or preparations unless they are qualified emergency medical technicians or paramedics rendering care. Medication prescribed in the United States, validated by a medical professional if not U.S.-prescribed, or in the detainee's possession during general processing in a properly identified container with the specific dosage indicated, must be self-administered under the supervision of an officer/agent. If a detainee is unable to self-administer their medications due to age or disability, officers/agents may assist the detainee. All detainee refusals of prescribed medication or medical assistance must be noted in the appropriate electronic system(s) of record.

**Non U.S.-Prescribed Medication:** Any detainee, not in general processing, with non U.S.-prescribed medication, should have the medication validated by a medical professional, or should be taken in a timely manner to a medical practitioner to obtain an equivalent U.S. prescription. Exceptions to this requirement may only be made by a supervisor in collaboration with a medical professional and based on expected duration of detention and/or elective

nature of the medication. If such an exception is made, it must be recorded in the appropriate electronic system(s) of record.

**Emergency Medical Services Transfer:** If a detainee is transferred by emergency medical services for further medical treatment, at least one officer/agent shall escort or follow the emergency vehicle and remain with the detainee until medical authorities determine whether the situation will require hospitalization or continued medical care.

**Hospitalization:** If the detainee is hospitalized, officers/agents will follow their operational office's policies and procedures, and document the hospitalization in the appropriate electronic system(s) of record. At a minimum, the discharge summary, treatment plans, and prescribed medications from any medical evaluation should accompany the detainee upon transfer or repatriation.

**Health Information Privacy:** A detainee's private health/medical information must be protected, and disseminated only to those personnel with a legitimate need to know, according to the operational office's policies and procedures.

## 4.11 HYGIENE

**Basic Hygiene Items:** Detainees must be provided with basic personal hygiene items, consistent with short term detention and safety and security needs. Families with small children will also have access to diapers and baby wipes.

**Showers:** Reasonable efforts will be made to provide showers, soap, and a clean towel to detainees who are approaching 72 hours in detention.

**Restrooms:** Detainees using the restroom will have access to toiletry items, such as toilet paper and sanitary napkins. Whenever operationally feasible, soap may be made available.

## 4.12 BEDDING

Clean bedding must be provided to juveniles. When available, clean blankets must be provided to adult detainees upon request.

## 4.13 FOOD AND BEVERAGE

**General:** Food and water should never be used as a reward, or withheld as punishment. Food provided must be in edible condition (not frozen, expired or spoiled).

**Meal Timeframe:** Adult detainees, whether in a hold room or not, will be provided with food at regularly scheduled meal times.  All meal service must be documented in the appropriate electronic system(s) of record. For juvenile meal timeframes, see Section 5.6.

**Snack Timeframe:** Adult detainees, whether in a hold room or not, will be provided with snacks between regularly scheduled meal times.  For juvenile snack timeframes, see Section 5.6.

**Requests:** When an adult detainee requests a snack or food before the next food service, officers/agents may grant the request on the basis of the circumstances.

**Dietary Restrictions:** Officers/Agents should remain cognizant of a detainee's religious or other dietary restrictions.

## 4.14 DRINKING WATER

Functioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees.

## 4.15 RESTROOM FACILITIES

**Restroom Facilities:** Restroom accommodations will be available to all detainees and a reasonable amount of privacy will be ensured.  If the detainee is suspected of being an internal carrier, restroom use may be monitored.

**Privacy:** Officers/Agents must make a reasonable effort to afford privacy to all detainees of the opposite gender consistent with the prohibition on voyeurism.

## 4.16 OPEN AREA SECURITY

Additional caution must be exercised to ensure the safety of the public and staff in open areas.  Officers/Agents working in or transiting this area must exercise due diligence to safeguard their firearms and other weapons.  Staff must also ensure that all potential egress points are utilized in a manner that reduces escape risk.

# 5.0 AT-RISK POPULATIONS

The at-risk determination process can be found in Section 4.2.

## 5.1 GENERAL

*At-Risk Populations:* Individuals in the custody of CBP who may require additional care or oversight, who may include: juveniles; UAC; pregnant individuals; those known to be on life-sustaining or life-saving medical treatment; those at higher risk of sexual abuse (including but not limited to gender nonconforming, intersex, and transgender); reported victims of sexual abuse; those who have identified mental, physical or developmental disabilities; those of advanced age; or family units.

*General Standard:* CBP staff will treat all at-risk populations with dignity, respect and special concern for their particular vulnerability.

*Reasonable Accommodations:* Reasonable accommodations must be made for at-risk detainees with known or reported mental and/or physical disabilities, in accordance with security and safety needs and all applicable laws and regulations.

*Hold Room Supervision:* Officers/Agents will physically check hold rooms on a regular and frequent manner, according to each operational office's policies and procedures. Physical inspections must be recorded in the appropriate electronic system(s) of record as soon as practicable.

*Communication:* Extra efforts may be required to ensure an at-risk detainee's ability to comprehend officer/agent instructions, questions and applicable forms (such as age and/or developmentally appropriate communication, translation/interpretation services).

*Detainees with Communication Disabilities:* Officers/Agents should take steps to communicate with detainees who have communication disabilities (e.g., detainees who are hearing impaired, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities) in an effective manner, utilizing available auxiliary aides and services, such as access to in-person, telephonic, or video interpretive services.

*Detainee Age:* If a detainee presents themselves as a juvenile, they will be treated as a juvenile, until established otherwise. If a detainee presents themselves as an adult they will be processed as an adult, unless a preponderance of evidence indicates they are a juvenile, in which case they will be treated as a juvenile.

*Release of At-Risk Detainees:* Officers/Agents must not release an at-risk detainee to any person or entity that officers/agents have reason to believe may harm or neglect the at-risk detainee.

*Personal Property and Legal Papers – Juveniles:* All personal property (including any U.S.-prescribed medications) and legal papers that are in the juvenile's possession, or are served upon the juvenile during processing, must accompany the juvenile upon transfer to any other agency or facility.

## 5.2 UAC SCREENINGS

In addition to the at-risk determination process in Section 4.2, CBP will ensure that all UAC will be screened for the following:
  Credible Fear determination;
  Human trafficking victimization; and
  Ability to make an independent decision.

A reasonable effort must be made to afford privacy to UAC during screening.

## 5.3 DOCUMENTATION

All custodial actions, notifications, and transports that occur after the at-risk detainee has been received into a CBP facility must be accurately recorded in the appropriate electronic system(s) of record as soon as practicable. The electronic system of record must contain the information listed below:
  Name of the person detained
  Country of birth (COB)
  Date of birth (DOB)
  Date and time placed into unattended secure area
  Date and time removed from unattended secure area
  Reason detained
  Apprehending officer's/agent's name
  Processing officer's/agent's name
  Supervisor's name

Personal belongings secured, receipted, and/or returned

Screened for trafficking (yes/no)

Telephone use, including the identity and/or relationship of the person contacted

Language services provided and language spoken if other than English or Spanish

Reasonable medical care requested/provided/declined

Detainee receipt of list of legal services providers

Bedding provided/declined

Meals provided/meals refused

Visual and/or verbal checks completed

Showers, if provided

Hospitalizations

Any U.S. medications prescribed

Transporting agency, and mode of transportation

Date/time departing the station

Time in and time out of each CBP facility

Required forms provided

Date/time of notice to ICE FOJC (if applicable)

Date/time of notice to ORR (if applicable)

Date/time of response from ICE FOJC (if applicable)

Date/time of response from ORR (if applicable)

Date/time of placement in ORR custody (if applicable)

Final disposition

***Electronic Systems of Record:*** Documentation must be maintained for all detainees placed in CBP hold rooms in the appropriate electronic system(s) of record. In the event that the electronic system is inoperable, paper logs must be used until the electronic system is operational. Any information recorded on paper logs must be entered into the appropriate electronic system(s) of record once the system is available.

## 5.4 TRANSPORT

***Gender of Transporting Officer/Agent:*** Whenever operationally feasible, the transporting of at-risk detainees must be conducted by two officers/agents with at least one officer/agent of the same gender or gender identity as the detainee. When transporting at-risk detainees of the opposite gender or gender identity, transportation staff must call in their time of departure and odometer reading, and then do so

again upon arrival, according to the operational office's policies and procedures.

***Transport of Family Units and Adult Females:*** Whenever operationally feasible, family units and adult females must be separated from unrelated adult males by separate passenger compartments, an empty row of seats, or transported separately. During scheduled transport, family units and adult females must be separated from unrelated adult males by either a separate passenger compartment or an empty row of seats.

***Transport of UAC:*** UAC must not be transported in vehicles with unrelated adults when separate transportation is immediately available. When separate transportation is unavailable, all necessary precautions must be taken to ensure the UAC's safety, security, and well-being, including separation from unrelated adults by either a separate passenger compartment or an empty row of seats.

***Child Safety Restraints:*** All juveniles must be transported as safely as possible given the circumstances, which must include the use of child safety restraints when available.

***Notification of Accompanying Adult:*** Whenever possible, officers/agents must inform or notify any accompanying adult relative or legal guardian when the transport of a juvenile to a medical facility is necessary for an X-ray search, body cavity search, or MBM. Such persons may be allowed to be present at the medical facility at the discretion of the CBP supervisor, and consistent with the operational office's policies and procedures.

## 5.5 SEARCH

***Gender of Searching Officer/Agent:*** Whenever operationally feasible, officers/agents conducting a search, or present at a medical examination, must be of the same gender, gender identity, or declared gender as the detainee being searched.

***Gender Determination:*** Officers/Agents must not search or physically examine a detainee for the sole purpose of determining the detainee's gender-related characteristics. If the detainee's gender is unknown, officers/agents will ask the detainee their gender or gender identity. If the detainee declines to state their gender, the gender will be recorded in

the appropriate electronic system(s) of record as unknown.

**Search of Individuals– Juvenile:** When a search involves a juvenile, prior supervisory authorization must be obtained in all cases with the exception of pat-down searches. Although officers/agents have the same authority to search a juvenile as to search an adult, officers/agents should weigh all factors before requesting authorization to further search a juvenile.

**Visual Body Cavity Search – Juvenile:** Officers/ Agents must not conduct visual body cavity searches of juveniles and, instead, shall refer all such body cavity searches of juveniles to a medical practitioner.

**Accompanying Adult:** If an adult parent or legal guardian accompanies the juvenile, officers/agents should explain the reasons for the search to the adult, as well as the juvenile.

**Adult Consent and Presence:** If a strip search, X-ray search, body cavity search, or MBM is necessary during the processing of a juvenile, officers/agents should seek consent from the parent or legal guardian. If the adult does not give their consent, a decision to determine the next appropriate steps must be made by a CBP supervisor after obtaining legal advice from CBP counsel. In most cases, the adult should be present during searches. If the adult is of a different gender than the juvenile, and/or the juvenile does not want the adult present when a strip search, X-ray search, body cavity search, or MBM is conducted, the adult should wait immediately outside the search room in order to afford the juvenile as much privacy as possible.

**Consultation Requirement for Certain UAC Searches:** In the case of a UAC, although consent may be granted by the UAC or HHS under limited circumstances, supervisors must consult with CBP counsel prior to conducting a strip search or before a UAC undergoes an X-ray search, body cavity search, or MBM.

**Supervisory Approval for an X-ray Search:** An X-ray search will be conducted only after being approved by a supervisor authorized by the operational office's policies and procedures and after obtaining consent or a search warrant. If a qualified medical practitioner determines that immediate action must

be taken to protect the health of the detainee, such action is authorized. The approval requirement cannot be further delegated.

**Medical Facility Requirement for X-ray Search:** Medical practitioners will conduct the X-ray at a medical facility. Officers/Agents are prohibited from conducting X-ray examinations, or utilizing any CBP equipment to conduct an X-ray examination. Only qualified medical practitioners may read and interpret the X-ray.

**Consent for an X-ray Search:** Consent to search must be freely and voluntarily given as it relates to X-rays before the X-ray is administered. Involuntary X-ray searches require a court order. Involuntary X-ray searches will be conducted only under the most extraordinary circumstances, and never on detainees who are pregnant or a detainee who refuses to have a pregnancy test after having been determined by medical personnel to require a pregnancy test.

**Revocation of Consent for an X-ray Search:** A detainee, including an at-risk detainee, may revoke consent for an X-ray search at any time, even at the medical facility. The revocation may be verbal or by actions. If the detainee revokes consent, officers/ agents must immediately inform the medical practitioner to stop the X-ray search based on the revocation of consent and notify their supervisor. Revocation of consent must be documented in the appropriate electronic system(s) of record.

**Communication:** Officers/Agents must ensure that the explanation of the X-ray process and consent agreement is in a language or manner the detainee comprehends.

**Pregnancy Test:** When a detainee is taken to a medical facility for an X-ray search, medical personnel will determine if a pregnancy test is required prior to an X-ray. If medical personnel determine a pregnancy test is necessary and the detainee refuses the pregnancy test, a decision to determine the next appropriate steps must be made by a CBP supervisor after obtaining legal advice from CBP counsel.

**Documentation:** When performing a strip searches on at-risk detainees or when an at-risk detainee undergoes an X-ray searches, a body cavity search, or an MBM, all relevant facts of the search, such as

witnesses, authorizing supervisors, and consent, must be recorded in the narrative section of the appropriate electronic system(s) of record.

## 5.6 DETENTION

**Least Restrictive Setting:** Officers/Agents will place each at-risk detainee in the least restrictive setting appropriate to their age and special needs, provided that such setting is consistent with the need to ensure the safety and security of the detainee and that of others. Adult at-risk detainees will not simply be placed in the least restrictive setting available, if they strongly communicate a preference for being held in a hold room.

**Expeditious Processing:** Whenever operationally feasible, at-risk individuals will be expeditiously processed to minimize the length of time in CBP custody.

**Family Units:** Generally, family units with juveniles should not be separated. When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures. In circumstances where family units must be separated due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record.

**Unaccompanied Juvenile Siblings:** Whenever operationally feasible, UAC siblings should not be separated, unless deemed necessary for safety purposes. In circumstances where siblings must be separated due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record.

**Nursing Mother and Children:** In situations where a detained female is nursing, the child will not be removed from the care of the mother unless she poses a danger to the child or if she will be transferred to the custody of another agency for criminal prosecution.

**Separation of Children from Parents or Legal Guardians:** In those instances where a parent or legal guardian and U.S. citizen child must be separated, social services may need to be contacted to take custody of the child. CBP should ensure parents have the opportunity to arrange for care of their children before contacting a social service agency. In those instances where a parent or legal guardian and a non-U.S. citizen child must be separated, the non-U.S. citizen child will be classified as a UAC and will be processed accordingly.

**Detention – UAC and Juveniles:** UAC must be held separately from adult detainees. A juvenile may temporarily remain with a non-parental adult family member where: 1) the family relationship has been vetted to the extent feasible, and 2) the CBP supervisor determines that remaining with the non-parental adult family member is appropriate, under the totality of the circumstances.

**Transfer to the Department of Health and Human Services, Office of Refugee Resettlement (ORR):** Every effort must be made to transfer UAC from CBP to ORR custody as soon as possible, but no later than 72 hours after determining that a child is a UAC. Requested placement notifications for the UAC must be conducted and logged in the appropriate electronic system(s) of record. The reasons for any detention longer than 72 hours must be logged in the appropriate electronic system(s) of record.

**Hygiene Articles, Bedding and Clean Clothing - Juveniles:** Juveniles will be given access to basic hygiene articles, and clean bedding. When available, juveniles will be provided clean and dry clothing. Officers/Agents may give access to these provisions to any juvenile at any time.

**Meals and Snacks – Juveniles, Pregnant, and Nursing Detainees:** Juveniles and pregnant detainees will be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times. At least two of those meals will be hot. Juveniles and pregnant or nursing detainees must have regular access to snacks, milk, and juice.

**Age and Capabilities Appropriate Food:** Food must be appropriate for at-risk detainees' age and capabilities (such as formula and baby food).

**Showers – Juveniles:** Reasonable efforts will be made to provide showers, soap, and a clean towel to juveniles who are approaching 48 hours in detention.

**Showers – Transgender or Intersex Detainees:**
Whenever showers are provided, transgender and intersex detainees will be given the opportunity to shower separately from other detainees.

**Hold Rooms – UAC:** Hold rooms for UAC must provide the following:

- Toilets and sinks;
- Professional cleaning and sanitizing at least once per day;
- Drinking fountains or clean drinking water along with clean drinking cups;
- Adequate temperature control and ventilation; and
- Clean bedding.

**Access to Medical Care:** Any physical or mental injury or illness observed by or reported to an officer/agent should be reported to a supervisor and appropriate medical care should be provided or sought.  Emergency services will be called immediately in the event of a medical emergency.  Officers/Agents must notify the shift supervisor of all medical emergencies as soon as possible after contacting emergency services and document the incident in the appropriate electronic system(s) of record.

**Consular and Telephone Access – UAC:** All UAC must be advised of their right to consular and telephone access in a language or manner the detainee comprehends.

## 5.7 USE OF RESTRAINTS

**General:** The use of restraints on at-risk detainees must be in a manner that is safe, secure, humane, and professional.  It is the responsibility of officers/agents to ensure that the need and level of restraints used is consistent with the operational office's policies and procedures.  At no time will restraints be used in a punitive manner or in a manner that causes detainees undue pain.

**Pregnant Detainees and Juveniles:** Barring exigent circumstances, officers/agents must not use restraints on pregnant detainees or juveniles unless they have demonstrated or threatened violent behavior, have a history of criminal and/or violent activity, or an articulable likelihood of escape exists.  Even in the extraordinary circumstance when restraints are deemed necessary, no detainee known to be pregnant will be restrained in a face-down position, on her back, or in a restraint belt that constricts the area of the pregnancy.  All exceptions must be documented in the appropriate electronic system(s) of record, including the facts and the reasoning behind the decision.

**Post-delivery Recuperation:** A detainee in post-delivery recuperation must not be restrained absent extraordinary circumstances that render restraints absolutely necessary.

**Active Labor or Delivery:** Restraints are never permitted on detainees who are in active labor or delivery.

# 6.0 SEXUAL ABUSE VICTIMIZATION

**General:** Sexual abuse includes: 1) sexual abuse and assault of a detainee by another detainee; and 2) sexual abuse and assault of a detainee by a staff member, contractor, or volunteer.

**Heightened Protection:** Officers/Agents must provide detainees identified under the at-risk determination process in Section 4.2 to be at high risk of sexual abuse victimization, with heightened protection.  This includes continuous direct sight and sound supervision, single-occupancy hold room, monitoring in open areas or placement in a hold room actively monitored on video by an officer/agent sufficiently proximate to intervene, unless no such option is determined to be feasible.

**Imminent Risk:** When an officer/agent has a reasonable belief that a detainee is subject to a substantial risk of imminent sexual abuse, he or she shall take immediate action to protect the detainee.

**Disabilities:** Detainees with disabilities (e.g., detainees who are hearing impaired, those who are blind or have low vision, or those who have intellectual, psychiatric, or speech disabilities), must have access to CBP efforts to prevent, detect, and respond to sexual abuse.  When necessary to ensure effective communication with detainees who are hearing impaired, such steps must include providing access to in-person, telephonic, or video interpretive services that enable effective, accurate, and impartial interpretation, both receptively and expressively, using any necessary specialized vocabulary.  In addition, any written materials related to sexual abuse will be provided in formats or through methods that ensure effective communication with detainees with disabilities, including detainees who have intellectual disabilities, limited reading skills, or who are blind or have low vision. Whenever translation or interpretation services are provided, it must be recorded in the appropriate electronic system(s) of record.

**Interpretation Services Access Related to Allegations of Sexual Abuse:** In matters relating to allegations of sexual abuse, officers/agents will provide in-person or telephonic interpretation services that enable effective, accurate, and

impartial interpretation, by someone other than another detainee, unless the detainee expresses a preference for another detainee to provide interpretation, and the supervisor determines that such interpretation is appropriate and consistent with the operational office's policies and procedures. The provision of interpreter services by minors, alleged abusers, detainees who witnessed the alleged abuse, and detainees who have a significant relationship with the alleged abuser is not appropriate in matters relating to allegations of sexual abuse.

**U Nonimmigrant Status Information:** Officers/Agents must provide timely access to U nonimmigrant status information to any detainee alleging criminal sexual abuse.

**Officer/Agent Responder Responsibilities:** Upon learning of an allegation that a detainee was sexually abused, the first law enforcement staff member to respond to the report, or his or her supervisor, must:

> Separate the alleged victim and abuser/assailant;
> Preserve and protect, to the greatest extent possible, any crime scene until appropriate steps can be taken to collect any evidence;
> Request that the alleged victim not to take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating if the sexual abuse occurred within a time period that still allows for the collection of physical evidence; and
> Ensure that the alleged abuser/assailant does not take any actions that could destroy physical evidence, including, as appropriate, washing, brushing teeth, changing clothes, urinating, defecating, smoking, drinking, or eating if the abuse occurred within a time period that still allows for the collection of physical evidence

**Non-Officer/Agent Responder Duties:** If the first staff responder is not law enforcement staff, the responder must request that the alleged victim not take any actions that could destroy physical evidence and then notify law enforcement staff.

***Detainee Reporting Mechanisms:*** Staff must:

Accept sexual abuse reports made verbally, in writing, anonymously, and from third parties;

Inform detainees of multiple ways to privately report sexual abuse; retaliation for reporting sexual abuse, or staff neglect or violations of responsibilities that may have contributed to such incidents;

Provide instructions on how detainees may contact the DHS Office of Inspector General;

Promptly record such reports according to the operational office's policies and procedures; and

Provide and inform the detainees of at least one way for detainees to report sexual abuse anonymously to a public or private entity or office outside of CBP in accordance with the operational office's policies and procedures.

***Staff Reporting Requirements:*** In accordance with the operational office's policies and procedures, staff must immediately report:

Any knowledge, suspicion, or information regarding an incident of sexual abuse against any detainee;

Retaliation against detainees or staff who reported or participated in an investigation about such an incident; and

Staff neglect or violation of responsibilities that may have contributed to an incident or retaliation.

***Sexual Abuse Reporting:*** If a known or reported victim of sexual abuse is transferred within CBP or to the custody of another component within DHS, the officer/agent must, as permitted by law, inform the receiving CBP office or DHS component of the incident and the victim's potential need for medical or social services.

If a known or reported victim of sexual abuse is transferred outside of DHS, the officer/agent must, as permitted by law, inform the receiving agency or office of the incident and the victim's potential need for medical or social services, unless the victim requests otherwise.

***Access to Medical Services:*** Detainee victims of sexual abuse must have timely, (including emergency) unimpeded access to medical treatment and crisis intervention services, including sexual assault forensics medical exam, emergency contraception and sexually transmitted infections prophylaxis, in accordance with professionally accepted standards of care.  The forensic medical examination should be done by qualified health care personnel, including a Sexual Assault Forensic Examiner (SAFE) or Sexual Assault Nurse Examiner (SANE) where practicable.  If SAFEs or SANEs cannot be made available, the examination can be performed by other qualified health care personnel.

***Access to Victim Services:*** If, in connection with an allegation of sexual abuse, the detainee is transported for a forensic examination to a medical facility that offers victim advocacy services, officers/agents will permit the detainee to use such services to the extent available, consistent with security needs.

***Cost of Medical Treatment Services:*** Emergency medical treatment services provided to the victim will be without financial cost and regardless of whether the victim names the abuser or assailant, or cooperates with any investigation arising out of the incident.

***Prohibition against Retaliation:*** CBP staff must not retaliate against any person, including a detainee, who alleges or complains about mistreatment, participates in an investigation into an allegation of staff misconduct, including sexual abuse, or for participating in sexual activity as a result of force, coercion, threats, or fear of force.

# 7.0 PERSONAL PROPERTY

## 7.1 GENERAL

**Operational Office Policies and Procedures:**
Operational offices are responsible for creating policies and procedures relating to the handling, retention, retrieval, and return of detainee personal property.

**Personal Property:** All detainees' personal property discovered during apprehension or processing and not deemed to be contraband will be safeguarded, itemized according to the operational office's policies and procedures, and documented in the appropriate electronic system(s) of record.

**Monetary Personal Property:** Special attention must be given to the security and return of the detainee's cash, currency, negotiable instruments, and debit/credit cards. The type, amount, and value of all detainee's cash, currency, and negotiable instruments must be recorded in the appropriate electronic system(s) of record.

**Legal Papers:** Copies of any legal papers signed by the detainee shall be provided to the detainee according to the operational office's policies and procedures.

**Personal Property and Legal Papers – Juveniles:** All personal property (including any U.S.-prescribed medications) and legal papers that are in the juvenile's possession, or are served upon the juvenile during processing, must accompany the juvenile upon transfer to any other agency or facility.

**Contraband:** Contraband will be properly disposed of according to the operational office's policies and procedures.

**Seized Property:** Personal property seized as evidence or seized for possible forfeiture will be handled according to the operational office's policies and procedures.

**Transfer:** Whenever operationally feasible, officers/agents will transfer a detainee's personal property with the detainee when the detainee is transferred within CBP. Officers/Agents will make every effort to transfer a detainee's personal property with the detainee when the detainee is transferred to another agency, repatriated, and/or released. If personal property cannot be transferred with the detainee, CBP will generally hold personal property for a minimum of 30 days from the processing of a detainee. After 30 days personal property will be considered abandoned and may be destroyed.

**Retention and Retrieval of Personal Property:**
Detainees may designate a third-party to retain or retrieve their personal property on their behalf, including the consulate of their country of nationality.

## 7.2 PROCESSING AND STORAGE OF DETAINEES' PERSONAL PROPERTY

**Inventory:** The inventory of a detainee's personal property must be conducted in the presence of the detainee and recorded according to the operational office's policies and procedures.

**Storage of Personal Property:** A detainee's personal property will be stored in a secure storage room or area. The secure storage room or area must be maintained in a clean and orderly manner and inspected as often as necessary to protect detainee property.

**Supervisor Responsibilities:** Supervisors must routinely inspect the secure storage room or area to ensure unclaimed property is handled according to the operational office's policies and procedures.

**Supervisor Notification:** Supervisors must be notified when itemized personal property, including monetary personal property, is reported missing or damaged. Supervisors will investigate and make the appropriate notifications according to the operational office's policies and procedures.

## 7.3 NOTICE TO DETAINEES

All personal property instructions must be communicated to the detainee in a language or manner the detainee can comprehend.

Detainees with personal property who are not being immediately repatriated to a contiguous country must receive notice of CBP's procedures relating to personal property, including:

> The process for claiming personal property upon release, transfer or removal.
> The process for having a third party claim personal property.
> The process for claiming lost property.

## 7.4 POSSESSIONS KEPT ON THE DETAINEE

At the discretion of officers/agents, a detainee may keep some personal items in their possession, as long as a particular item does not pose a threat to the security or good order of the facility.

## 7.5 MEDICATIONS

All medications will generally be maintained with the detainee's personal property unless other conditions warrant, such as the medication needing to be regularly administered due to need, and/or needing to be properly stored as the prescription requires.

## 7.6 IDENTIFICATION DOCUMENTS

Documents determined to be genuine, unaltered, and issued under the proper authority to the detainee, must be returned to the detainee upon release, removal or repatriation or maintained in the detainees' personal property.  Documents will not be retained based solely on apparent gender-related discrepancies in gender designations, names, or photographs, absent any other indication the document is not genuine or unaltered.

# 8.0 DEFINITIONS

Solely for purposes of this document, the below terms are defined as follows:

**Adult:** A person known or reasonably believed to be 18 years of age or older.

**Agent:** Any class of CBP employees designated by the Commissioner to perform the functions of a Border Patrol and/or Air & Marine Agent.

**At-Risk Populations/At-Risk Detainees:** Individuals in the custody of CBP who may require additional care or oversight, who may include: juveniles; UAC; pregnant individuals; those known to be on life-sustaining or life-saving medical treatment; those at higher risk of sexual abuse (including but not limited to gender nonconforming, intersex, and transgender); reported victims of sexual abuse; those who have identified mental, physical or developmental disabilities; those of advanced age; or family units.

**Bedding:** A (or any combination of) blanket, mat, or cot.

**Body Cavity Searches:** A body cavity search is any internal search consisting of the visual or physical intrusion into the rectal or vaginal cavity.

**Contraband:** Any item possessed by a detainee that is prohibited under CBP policies or federal, state or local law and/or regulation.

**Commercial Air Transport:** The use of aircraft not owned or controlled by the U.S. Government, to move detainees.

**Contractor:** A person who, or entity that, provides services pursuant to a contractual agreement with CBP or other federal entity.

**Custody:** The control of the detainee whose freedom of movement is directly limited.

**De-escalation:** The reasonable use of words and actions to reduce a heightened emotional and physical state, in order to facilitate a calm, rational interaction.

**Detainee:** Any person, regardless of citizenship or nationality, under arrest, restrained, or confined by CBP.

**Detention:** Restraint from freedom of movement. Physical restraint is not an essential element of detention.

**Direct Supervision:** The constant sight and sound observation of a detainee by an officer/agent. This does not include video monitoring of detainees.

**Electronic System(s) of Record:** A group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual.

**Employee:** A person who works directly for CBP.

**Escape:** The departure of a detainee from CBP custody without authorization.

**Escape Risk:** Any detainee whom an officer/agent believes may attempt to flee from CBP custody if not prevented.

**Escort:** The accompanied movement of a detainee in CBP custody by an officer/agent.

**Exigent Circumstances:** Any set of temporary and unforeseen circumstances that requires immediate action in order to combat a threat to the security or institutional order of a facility or a threat to the safety or security of any person.

**External Search:** Non-intrusive searches conducted to determine if detainees are carrying contraband/weapons outside of their bodies, including immediate pat-downs/terry frisks, and pat-downs.

**Facility:** A place, building (or part thereof), set of buildings, structure, or area that was constructed or retrofitted for the purpose of detaining individuals and is routinely used by CBP to detain individuals in its custody.

**Family Unit:** A group of detainees that includes one or more non-United States citizen juvenile(s) accompanied by his/her/their parent(s) or legal guardian(s), whom the agency will evaluate for safety purposes to protect juveniles from sexual abuse and violence.

**Gender identity:** How a person sees themselves and understands their own gender identity (a man, a woman, other).

**Gender Nonconforming:** Having an appearance or manner that does not conform to traditional societal gender expectations.

**Holding Facility:** A structure that contains hold rooms, or other secure enclosures that are:
Under the control of CBP; and
Primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, jail, prison, other agency, or elsewhere within CBP.

**Hold Room:** A secure area in a holding facility used for temporary confinement of detainees.

**Human Trafficking:** A modern day form of slavery involving the illegal trade of people for exploitation, or commercial gain. The use of force, fraud or coercion is used to lure victims into forced labor, commercial sexual exploitation or slavery. In cases of sex trafficking, for children under the age of 18, no force, fraud, or coercion is needed.

**Immediate Pat-down/*Terry* Frisk:** An external search necessary to ensure officer safety. A limited search for weapons, generally of the outer clothing.

**Immediate Relative:** A person related to a detainee in one of the following ways: spouse, parent, grandparent, child, sibling, aunt, uncle, or legal guardian.

**Internal Search:** Searches conducted to determine if detainees are carrying contraband close to or inside their bodies. Internal searches include and are limited to medical x-rays, body cavity searches, and monitored bowel movement (MBM) searches.

**Intersex:** Having sexual or reproductive anatomy that does not seem to fit typical definitions of male or female. Intersex individuals may have organs of both sexes, present at birth, due to chromosomal circumstances.

**Juvenile:** A person known or reasonably believed to be less than 18 years of age.

**Law Enforcement Staff:** Officers or Agents of CBP or a CBP facility that are responsible for the supervision and control of detainees in a holding facility.

**Medical Facility:** An accredited location where medical practitioners conduct medical exams, diagnostics, and/or provide care.

**Medical Practitioner:** A health professional who, by virtue of education, credentials, and experience, is permitted by law to evaluate and care for patients within the scope of his or her professional practice.

**Medical Witness:** A credentialed or qualified medical provider (such as a doctor, nurse, medical student, paramedic) of a healthcare facility legally competent to serve as a witness to a medical event such as a procedure or exam. Medical bystanders often provide assistance to the event and may be called on for legal testimony related to the event.

**Medication:** A medicine used to treat an illness or injury.

**Monitored Bowel Movement (MBM):** An MBM search is an internal search consisting of detaining a suspect in a room or holding cell without flushable toilet facilities, under close observation, to permit time for a swallowed object to be expelled by the body through natural means.

**Officer:** Class of CBP employees designated by the Commissioner, responsible for the inspection of arriving and departing persons, conveyances and baggage at ports of entry.

**Open Area:** An area within a holding facility where the detainee is not in a locked room but where there are locked doors to prevent escape (e.g., a processing room).

**Operational Office:** Components within CBP including the Office of Field Operations, the U.S. Border Patrol, and the Office of Air and Marine.

**Pat-down Search:** An external search consisting of the sliding or patting of the hands over the clothed body of a detainee by staff to determine whether the individual possesses weapons and/or contraband. A pat-down search may require the detainee to reveal pocket contents.

**Personal Property:** Belongings found on the detainee's person or carried by a detainee (e.g., a detainee's baggage, money, personal identification, clothing, jewelry, mobile device, medication). This *does not include items deemed to be contraband.*

**Probe/Probing:** The use of an instrument to explore the inside of an object physically attached to a detainee (e.g., cast, brace, etc.).

**Processing Area:** The secure location in a CBP facility where officers/agents conduct interviews, record detainee responses, and enter required information into appropriate electronic system(s) of record.

**Reasonable Suspicion:** A particularized and objective basis supported by specific and articulable facts for suspecting a person of violating the law.

**Restraints:** CBP-approved equipment used to restrict a detainee's movement.

**Search of an Individual:** Any search of a person conducted for an official law enforcement purpose. This includes: immediate pat-down/*Terry* frisk, pat-down search, search incident to lawful arrest, strip search, medical X-ray search, body cavity search, and monitored bowel movement.

**Secure Area:** An area, including a hold room, processing area, or open area where an individual is detained for a temporary period of time and where the likelihood of escape is minimized because points of egress are secured to prevent unauthorized use.

**Secured Vehicle:** A transport vehicle that is equipped with security measures that separate detainees from officers/agents, and limits detainee egress from the vehicle.

**Sexual Abuse:** Sexual abuse includes: 1) Sexual abuse and assault of a detainee by another detainee; and 2) Sexual abuse and assault of a detainee by a staff member, contractor, or volunteer.

**Sexual Abuse of a Detainee by Another Detainee:** Sexual abuse of a detainee by another detainee includes any of the following acts by one or more detainees, prisoners, inmates, or residents of the facility in which the detainee is housed who, by force, coercion, or intimidation, or if the victim did not consent or was unable to consent or refuse, engages in or attempts to engage in:

    Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

    Contact between the mouth and the penis, vulva, or anus;

    Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object;

    Touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, with an intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of any person; or

    Threats, intimidation, or other actions or communications by one or more detainees aimed at coercing or pressuring another detainee to engage in a sexual act.

**Sexual Abuse of a Detainee by a Staff Member, Contractor, or Volunteer:** Sexual abuse of a detainee by a staff member, contractor, or volunteer includes any of the following acts, if engaged in by one or more staff members, volunteers, or contract personnel who, with or without the consent of the detainee, engages in or attempts to engage in:

    Contact between the penis and the vulva or anus and, for purposes of this subparagraph, contact involving the penis upon penetration, however slight;

    Contact between the mouth and the penis, vulva, or anus;

    Penetration, however slight, of the anal or genital opening of another person by a hand or finger or by any object that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

    Intentional touching of the genitalia, anus, groin, breast, inner thighs or buttocks, either directly or through the clothing, that is unrelated to official duties or where the staff member, contractor, or volunteer has the intent to abuse, arouse, or gratify sexual desire;

    Threats, intimidation, harassment, indecent, profane or abusive language, or other actions or communications, aimed at coercing or pressuring a detainee to engage in a sexual act;

    Repeated verbal statements or comments of a sexual nature to a detainee;

Any display of his or her uncovered genitalia, buttocks, or breast in the presence of an inmate, detainee, or resident; or Voyeurism.

**Staff:** Employees or contractors of CBP or CBP facility, including any entity that operates within the CBP facility.

**Short Term Detention:** The temporary detention of a person at a CBP facility for the least amount of time necessary to complete processing, transfer, and/or repatriation.

**Strip Search:** An external search that requires a person to remove or arrange some or all clothing so as to permit a visual inspection of the person's breasts, buttocks, or genitalia.

**Supervisor:** Any permanent or acting officer/agent, designated and authorized to oversee staff and make management level decisions.

**Trafficking Victim:** A person forced into human trafficking.

**Transgender Individual:** A person whose gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned sex at birth.

**Transport:** The physical movement of a detainee by vehicle, vessel or commercial air transport.

**Unaccompanied Alien Child (UAC):** A child who:
has no lawful immigration status in the United States;
has not attained 18 years of age; and
with respect to whom:
(i) there is no parent of legal guardian in the United States; or
(ii) no parent or legal guardian in the United States is available to provide care and physical custody.

**Unsecured Vehicle:** A transport vehicle that is not equipped with security measures that separate detainees from officers/agents, and may not limit detainee egress from the vehicle.

**U Non-Immigrant Status:** U nonimmigrant status for victims of criminal activity designated in INA §101(a)(15)(U) (qualifying crimes) who have suffered substantial mental or physical abuse as a result of

being a victim of criminal activity, possess information concerning the crime, and are being helpful to law enforcement and government officials in the investigation or prosecution of the criminal activity.

**Vehicle:** A craft designed for land-based transportation.

**Vessel:** A craft designed for water-based transportation.

**Volunteer:** An individual who donates time and effort on a recurring basis to enhance the activities and programs of CBP.

**Voyeurism:** Inappropriate visual surveillance of a detainee for reasons unrelated to official duties. Where not conducted for reasons relating to official duties, the following are examples of voyeurism: staring at a detainee who is using a toilet in his or her cell to perform bodily functions; requiring an inmate detainee to expose his or her buttocks, genitals, or breasts; or taking images of all or part of a detainee's naked body or of a detainee performing bodily functions.

**Weapon:** Any object, item, or device that may be used to cause physical injury, incapacitate, or diminish capability, temporarily or permanently.

**X-ray Search:** The use of a medical X-ray by a medical practitioner to determine the presence of contraband within the body.