UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------

TAMEIKA LOVELL,

         Plaintiff,

   -against-

HELEN PARKER, ET AL.,

         Defendant.

----------------------------------x

**MEMORANDUM AND ORDER**

18-CV-1867 (KAM)

**MATSUMOTO, United States District Judge:**

        Plaintiff Tameika Lovell ("Ms. Lovell") brought this action against Defendants Stephen T. Twarowski ("Defendant Twarowski"), Helen Quanasia Parker ("Defendant Parker"), and Barbara Muñoz ("Defendant Muñoz"), in their personal capacities (collectively, "Defendants"), for alleged constitutional violations of the Fourth and Fifth Amendment pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Defendants have moved for summary judgment on all of Ms. Lovell's claims.[1]  For the reasons set forth below, Defendants' motion for summary judgment is granted.

---

[1] *See* ECF Nos. 66-1 Def. Mem. in Supp. for Summ. J; 66-3 Pl. Opp'n. to Summ. J.; 66-5 Def. Reply in Supp. for Summ. J.

## BACKGROUND

In the instant action, Ms. Lovell alleges that she was selected for a "pat-down, secondary, and body cavity search due to her race and gender" and without reasonable suspicion by Defendant Parker, as witnessed by Defendant Muñoz, and as authorized by Defendant Twarowski. (*See* ECF No. 66-3, Pl. Opp'n. to Summ. J. at 4.)  The Court has taken the relevant facts from the parties' declarations, depositions, exhibits, and from the parties' respective Rule 56.1 statements of facts.[2] Defendants' counsel Shana A. Priore declares that "true and correct copies of relevant portions of the deposition transcripts" of Ms. Lovell and Defendants Parker, Muñoz, and Twarowski are contained in the joint deposition transcript

---

[2] *See* ECF Nos. 62, Def. 56.1 Statement; 62-1, Def. Ex. B, OIG Twarowski Interview 12/13/16; 62-2, Def. Ex. C, OIG Parker Interview 4/12/17; 62-3, Def. Ex. E, OIG Muñoz Interview 12/16/16; 62-4, Def. Ex. F, CBP Personal Search Handbook; 62-5, Def. Ex. I, Decl. of Stephen Twarowski; 62-6, Def. Ex. J, DHS Personal Statement of Barbara Muñoz 12/13/16; 62-7, Def. Ex. K, DHS Personal Statement of Helen Parker 4/12/17; 62-8, Def. Ex. L, Security Footage 11/17/16; 62-9, Def. Ex. M, Incident Log Report 11/28/16; 62-10, Def. Ex. N, Lovell Passport; 62-11, Def. Ex. O, Queens County Declination of Prosecution; 62-12, Def. Ex. P, Decl. of Helen Parker; 62-13, Def. Ex. Q, Decl. of Barbara Muñoz; 62-14, Def. Ex. R, Plaintiff Tameika Lovell's SF-95 Form; 62-15 Def. Ex. S, Declination of Lovell's SF-95 Form; ECF No. 66-2 Decl. of Shana Priore; 66-4 Decl. of Eric Sanders; 66-6 Joint Deposition Transcript Appendix. Where the parties submitted the same evidence, such as the CBP Personal Search Handbook, interviews with the Department of Homeland Security's Office of Inspector General, and depositions, the Court will refer to Defendants' exhibits for ease of citations.  Other portions of the Ms. Lovell's record include ECF Nos. 63, Pl. Reply to Def. 56.1 Statement & Counter Statement ("Pl. 56.1 Reply"); 63-1, Pl. Ex. 1, GAO Report on Better Targeting of Airline Passengers for Personal Searches Could Produce Better Results ("GAO Report"); 63-3, Pl. Ex. 3, CBP Law Course Fifteenth Edition 2012; and 63-4, Pl. Ex. 4, National Standards on Transport, Escort, Detention, and Search 2015.

appendix ("JDTA").[3]   (*See* ECF No. 66-2, Priore Decl.)   Based on the parties' 56.1 Statements, the Court recounts the undisputed facts in the light most favorable to the nonmoving party.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).   The Court also notes where facts are disputed by the nonmoving party.

## I.   Factual Background

On November 27, 2016, at approximately 10:06 p.m., Ms. Lovell arrived from a vacation in Montego Bay, Jamaica, at John F. Kennedy International Airport in Queens, New York ("JFK"). (ECF No. 63, Pl. 56.1 Reply, ¶ 54.)   Traveling alone, Ms. Lovell went through customs, and was selected by employees of the Department of Homeland Security's ("DHS") Customs and Border Protection ("CBP") for a pat-down search.[4]   (*Id.*, ¶ 59.)   The CBP employees were Defendants Parker, Muñoz, and Twarowski.  (*See generally* Def. 56.1 Statement & Exs.; see also Pl. 56.1 Reply Exs.)   Defendants Parker and Muñoz were the officers who stopped and conducted the pat-down of Ms. Lovell.  (*Id.*)   Defendant Twarowski was a supervisory officer on duty that day who authorized the pat-down by Defendants Parker and Muñoz.  (*Id.*)

---

[3] The JDTA contains the Defendants' Exhibits A, D, G and H and Plaintiffs' Exhibits 8-11.)
[4] Ms. Lovell admits to traveling alone but denies to being stopped by Defendant Parker because she was traveling alone, as will be further detailed below.  (ECF No, 63, Pl. 56.1 Reply Statement, ¶ 59.)   Whether the pat-down search was "routine" is also disputed.  (*Id.*, ¶ 121.)

**A. CBP's Policies at International Airports for Authorizing and Conducting Pat-down and Partial Body Searches**

CBP officers assigned to an international airport's Passenger Enforcement Roving Team ("PERT") are responsible for surveilling and monitoring an airport's international terminal floor to randomly intercept and examine travelers arriving into the United States off of specific high-risk flights and flights from countries considered by CBP to have more illicit drug production or narcotics-trafficking.  (ECF No. 63, Pl. 56.1 Reply, ¶7.)

PERT officers consult intelligence gathered from other law enforcement agencies or sources on smuggling trends and countries to be on alert for incoming travelers.  (ECF Nos. 63, Pl. 56.1 Reply, ¶¶ 19-20; 66-6, JDTA at 98, 101, 124.)  Jamaica is designated as a "drug source" country, and is considered by CBP officers as a major drug-transit or illicit drug-producing country.  (ECF No. 63, Pl. 56.1 Reply, ¶ 19, ECF No. 66-6, JDTA at 131-33.).  On November 27, 2016, the evening of Ms. Lovell's incident at JFK, Defendants Parker and Muñoz were CBP officers on PERT duty and Defendant Twarowski was a supervisory officer of CBP and JFK's PERT. (*Id.*, ¶¶ 5-8.)  They were working at the airport's International Terminal floor at JFK International Airport on November 27, 2016.  (*Id.*)

CBP officers are trained to employ various techniques and tools to determine whether to conduct a routine pat-down search of an individual, including behavioral analysis, observational techniques, inconsistencies, and intelligence. (ECF Nos. 63, Pl. 56.1 Reply ¶¶ 12-16; 62-4, Def. Ex. F, CBP Personal Search Handbook at 2.)  According to Defendants' testimony, on November 27, 2016, the day they intercepted Ms. Lovell they were operating with the following intelligence that, *inter alia*, provided the bases for their search of Ms. Lovell: Mr. Lovell arrived at JFK from Jamaica, a "drug source" country; statistical smuggling trends indicated that single travelers were more likely than groups to transport illicit drugs into the United States and Ms. Lovell was travelling alone; travelers commonly concealed contraband in the breast and groin area and Ms. Lovell had tied a garment around her waist that concealed her groin area; and the inability of Ms. Lovell not being able to provide the name of her hotel in Jamaica was behavior consistent with illicit drug smuggling. (*See* ECF Nos. 66-6, JDTA at 42, 45, 48, 50, 131; 62-5, Def. Ex. I, Decl. of Stephen Twarowski at ¶¶ 7-8; 62-3 Def. Ex. E, OIG Muñoz Interview 12/16/16; 62-1 Def. Ex. B, OIG Twarowski Interview 12/13/16; 62-2 Def. Ex. C, OIG Parker Interview 4/12/17; 62-4, Def. Ex. F, CBP Personal Search Handbook at 2.)

Defendants also testified that passenger behaviors they analyzed included: physiological signs of nervousness such as shaking or trembling hands, rapid breathing for no apparent reason, cold sweats, pulsating carotid arteries, flushed face, and avoiding eye contact. (*Id.*)  Lastly, Defendants were on alert for inconsistencies in travelers' interviews with an officer, false statements, unreasonable explanations for travel, and unexplained irregularities in ticketing or reservations. (*See generally id.*; *see also* ECF No. 66-6, JDTA at 10.)  At times, this process involves engaging the traveler in conversation while observing their behavior. (*See* ECF No. 62-2 Def. Ex. C, OIG Parker Interview 4/12/17.)  Ms. Lovell admits that the CBP provides certain training and intelligence to help CBP officers determine who to intercept and pat down, but she broadly asserts without citing to evidence that CBP's "objectivity [is] rooted in subjective race and stereotyping." (*See* ECF No. 63, Pl. 56.1 Reply, ¶¶ 18-23.)

The CBP Personal Search Handbook and the GAO Report on Better Targeting of Airline Passengers for Personal Searches Could Produce Better Results ("GAO Report"), both of which Ms. Lovell relies on, provide, in part, that "customs policy is that a pat-down will be conducted only if an officer has some or mere suspicion that contraband is being concealed on the passenger." (See ECF Nos. 62-4 Def. Ex. F, CBP Personal Search Handbook, Ch.

1(b); see also 63-1, Pl. Ex. 1, GAO Report at 6.)  According to
CBP, to satisfy the "some" or "mere suspicion" standard,
inspectors must articulate to a supervisor at least one fact
before conducting a pat-down.  (ECF No. 62-4 Def. Ex. F, CBP
Personal Search Handbook, Ch. 1(b).)  Pursuant to this CBP
policy, articulable facts are ones that result from the CBP
officer's analysis of the situation, such as the traveler's
behavior, physiological signs, physical discrepancies in
appearance, inconsistencies in the traveler's history or
documents, and available intelligence. (*Id.*, Ch. 1(e).)  The
scope of a pat-down search, as described in the CBP Personal
Search Handbook, includes "patting the hands over the person's
clothed body." (*Id.*, Ch. 3(e).)

　　　　More intrusive searches, however, require that an
inspector have "reasonable suspicion" that a passenger may be
smuggling contraband.  (*See* ECF Nos. 62-4 Def. Ex. F, CBP
Personal Search Handbook, Ch. 3(b); *see also* 63-1, Pl. Ex. 1,
GAO Report at 4.)  The CBP Personal Search Handbook states that,
once a pat-down search has been conducted and a CBP officer
finds reasonable suspicion that material evidence is being
concealed, the officer must request approval from a supervisor
before conducting a "partial body search." (*Id.*, Ch. 4(a).)
The CBP Personal Search Handbook defines a "partial body search"
as the removal of some of the clothing—and only the traveler can

remove their own clothing—to recover material evidence reasonably suspected to be concealed on the body.  (*Id.*, Ch. 4(b).)  Ms. Lovell admits that she was not asked to remove any of her clothing and does not allege or present evidence that any of her clothing was removed.  (ECF No. 63, Pl. 56.1 Reply, ¶ 107.) The CBP Personal Search Handbook states that CBP officers cannot ask "a woman to spread...(the folds of the skin bordering the vagina)," as such a request would constitute a full body cavity search.  (ECF Nos. 62-4 Def. Ex. F, CBP Personal Search Handbook, Ch. 4(c)(3).)  Ms. Lovell does not claim or present evidence that she was asked to spread skin bordering her vagina. The CBP Personal Search Handbook submitted to this Court, however, does not address the permissible extent of a search of the groin area when clothing is still worn.

Following a pat-down search, CBP Officers have up to 24 hours to enter an incident report.  (ECF No. 63, Pl. 56.1 Reply Statement ¶ 53.)

**B. CBP Selects Ms. Lovell for a Pat-down Search**

When Ms. Lovell returned from vacation in Jamaica to JFK on the evening of November 27, 2016, CBP Officer Defendant Parker's PERT duty involved randomly stopping travelers reentering the country from a foreign territory within the International Terminal area of JFK.  (*Id.*, ¶¶ 9, 54.)  Ms. Lovell was traveling alone from Jamaica and entered the customs

area around 10:06 p.m., wearing black pull-on leggings, with underwear underneath, a brown shirt with a bra underneath, and a sweatshirt around her waist that covered her groin area. (ECF No. 63, Pl. 56.1 Reply Statement, ¶¶ 55-56.) Defendant Parker stopped Ms. Lovell and asked her to identify the origin of her trip, to which Ms. Lovell answered Jamaica. (ECF No. 63, Pl. 56.1 Reply Statement, ¶ 60.) Defendant Parker then asked Ms. Lovell for her passport and saw that Ms. Lovell's passport indicated that she had taken approximately twenty-two trips to Jamaica between July 2013 and November 2016. (ECF Nos. 63, Pl. 56.1 Reply Statement, ¶¶ 61, 67; 62-10, Def. Ex. N, Lovell Passport.) In Ms. Lovell's view, Defendant Parker "stopped plaintiff because she is an African-American female," but she offers no evidence in support of her view. (ECF No. 63, Pl. 56.1 Reply Statement, ¶¶ 61, 67.)

At approximately 10:09 p.m., Defendant Parker asked Ms. Lovell to proceed to the secondary baggage inspection area where she initiated a search of Ms. Lovell's luggage. (*Id.*, ¶¶ 61-69.) At this time, Defendant Muñoz, another CBP Officer assigned to PERT at JFK, approached the inspection area and observed Defendant Parker's search of Ms. Lovell's baggage. (*Id.*, ¶¶ 8, 64.) Defendant Muñoz also inquired about Ms. Lovell's occupation, and whether she had a boyfriend or husband in Jamaica. (ECF Nos. 63, Pl. 56.1 Reply, ¶¶ 70-71; 66-6, JDTA

at 180.)  Ms. Lovell responded that she worked as a school counselor and traveled when she had time off work and denied that she had a significant other in Jamaica.  (ECF Nos. 63, Pl. 56.1 Reply, ¶¶ 66, 71; 66-6, JDTA at 52.)

At approximately 10:13 p.m., another CBP Officer, Rene Roman ("Roman"), the PERT Team Leader on duty, approached the area where Ms. Lovell's bags were searched, inspected Ms. Lovell's passport and asked further questions, as Defendant Parker continued the baggage inspection.  (ECF No. 63, Pl. 56.1 Reply, ¶¶ 72-74.)  Ms. Lovell said that Roman specifically asked whether Ms. Lovell was "tenured" at her job, expressed interest in Ms. Lovell's ability to pay for multiple trips to Jamaica on a school counselor's salary, and commented that she was perhaps "spending too much money traveling."  (ECF No. 66-6, JDTA at 180.)  According to Defendants, when Defendant Parker asked Ms. Lovell where she had stayed while in Jamaica, Ms. Lovell could not identify the hotel in which she had stayed; but Ms. Lovell denies this fact without further description or evidence.  (*Id.*, 48; ECF No. 63, Pl. 56.1 Reply, ¶¶ 68, 69.)  Ms. Lovell's denial does not create a disputed issue of material fact, given the other undisputed evidence in the record, regarding the Defendant's articulated suspicions.  Defendant Parker also stated that she noticed throughout the secondary baggage

inspection, Ms. Lovell was breathing heavily and sweating.  (ECF No. 63, Pl. 56.1 Reply, ¶ 78.)

Defendant Parker testified that, upon completing Ms. Lovell's baggage inspection at approximately 10:16 p.m. (*id.*, ¶ 84), and based on what she had observed and heard, she believed that Ms. Lovell may have had a weapon, contraband, or evidence of a crime on or within her body.  (ECF Nos. 66-6, JDTA at 48; 63, Pl. 56.1 Reply at ¶ 10.)  Defendants testified that they were aware that they needed articulable facts as to the basis of their suspicion to conduct a routine pat-down of a traveler. (*See* ECF No.66-6, JDTA at 48-51.)

Pursuant to CBP policy, Defendants Parker and Muñoz obtained approval from Defendant Twarowski, the on-duty supervisor, to perform a pat-down search by providing at least one articulable fact supporting the need for a pat-down search to him.  (*Id.*, ¶¶ 4-5,25-27.)  Because Defendant Twarowski was not physically present in the International Terminal where Defendant Parker performed Ms. Lovell's initial interview and baggage inspection, Defendant Parker asked Roman to relay certain facts to Defendant Twarowski over the phone.  (*Id.* ¶¶ 80-81.)[5]  Defendant Twarowski testified to remembering the

---

[5]  Defendant Twarowski explained that Roman was permitted to forward the information to him because, Roman, a PERT Team Leader, was "considered an extension of the supervisor" and was at the terminal "to oversee and view and assess officers performing baggage searches."  (*See* ECF No.66-6, JDTA at 124.)

following articulable facts that Roman relayed: Ms. Lovell "was
coming from a source country for narcotics, she had multiple
short trips coming from the source country for narcotics, she
was traveling alone." (ECF No. 66-6, JDTA at 131.)

In view of the articulable facts relayed to him,
Twarowski authorized a pat-down search of Ms. Lovell. (*Id.* at
131, 138; Pl. 56.1 Reply, ¶ 83.)[6] Defendant Parker then escorted
Ms. Lovell to a private search room, so that she and Defendant
Muñoz could perform the search away from the public. (ECF No.
63, Pl. 56.1 Reply ¶ 86.)

**C. Pat-down Search at Issue**

The crux of the parties' dispute is what happened in
the room while Defendants Parker and Muñoz were conducting their
pat-down search of Ms. Lovell. Here, the parties' accounts
deviate, and the facts will be construed in a light favorable to
Ms. Lovell as the nonmoving party.

The pat-down search began inside the private room with
Defendant Parker asking Ms. Lovell if she was menstruating, or

---

[6] Ms. Lovell contends that "other than [Defendant Parker's statement], there's
no credible evidence" to support Defendant Twarowski authorization of the
pat-down search based on the articulated facts. The Court finds that the
undisputed evidence in the record, including Defendants Twarowski's,
Parker's, and Munoz's sworn statements, establish that Defendants had and
conveyed articulable facts to convey and obtain Defendant Twarowski's
authorization for the pat-down of Ms. Lovell. (ECF Nos. 66-6, JDTA at 83;
62-1, Def. Ex. B, OIG Twarowski Interview 12/13/16; 62-2 Def. Ex. C, OIG
Parker Interview 4/12/17; 62-3 Def. Ex. E, OIG Muñoz Interview 12/16/16; 62-
5, Def. Ex. I, Decl. of Stephen Twarowski at ¶¶ 7-8; 62-9, Def. Ex. M,
Incident Log Report 11/28/16.)

using any feminine hygiene products, and Ms. Lovell responded that she was not.  (ECF No. 63, Pl. 56.1 Statement, ¶¶ 87-88.) Defendant Parker also asked Plaintiff if she was concealing anything in her bra and Ms. Lovell responded that she was not. (*Id.*, ¶ 89.)  Defendants explained that the officer conducting the search will ask female travelers whether they are menstruating or wearing a sanitary napkin, padding, tissue or tampon so that the officer does not become alarmed if she feels an object in the groin area.  (ECF Nos. 62-2 Def. Ex. C, OIG Parker Interview 4/12/17, at 2; 66-6, JDTA at 225.)

Defendant Parker then asked Ms. Lovell to put her hands flat against the wall and to bend slightly at the knee, as required by CBP pat-down procedure.  (ECF No. 63, Pl. 56.1 Reply Statement, ¶¶ 39, 90.) Defendant Parker started the pat-down over Ms. Lovell's clothing, by feeling Ms. Lovell's arms and stomach, using her gloved palms, which Ms. Lovell does not deny. (*Id.*, ¶ 92.)

Next, however, Ms. Lovell testified that Defendant Parker "squeezed [her breasts]" while "checking the padding" of her bra.  (ECF No. 66-6, JDTA at 182, 197.)  Ms. Lovell recounted that, while she was squatting down, "[Defendant Parker] grabbed her breast so hard, she nearly fell over."  (ECF No. 63, Pl. 56.1 Reply Statement, ¶ 90.)  Meanwhile, Defendant

Muñoz stood to Ms. Lovell's right side, with a hand over Ms. Lovell's hand.  (*Id.*, ¶ 91.)[7]

Then, according to Ms. Lovell, Defendant Parker "stuck her fingers in [Ms. Lovell's] vagina." (ECF No. 66-6, JDTA at 182.)  Ms. Lovell testified that Parker "put her fingers in between my legs.  I had on leggings she moved my underwear to the side, and she stuck her fingers in my vagina.  After that she swiped her hand in between my buttocks." (*Id.*)  Ms. Lovell specified Defendant Parker's hands were not underneath Ms. Lovell's clothes, but that the material of her leggings was "very stretchy", and that Defendant Parker's fingers could "easily get to [her] private area." (*Id.* at 208-209.)  Ms. Lovell also testified that when Defendant Parker was checking Ms. Lovell's groin area, she asked, "what is that down there?" and Ms. Lovell answered, "it's my underwear." (*Id.* at 228.)  Ms. Lovell said that Defendant Parker then responded with "oh ok" and moved Ms. Lovell's underwear to the side and then used her fingers to penetrate Ms. Lovell. (*Id.*)  It is undisputed that during the pat-down search of Ms. Lovell's groin area, either the fabric of Ms. Lovell's underwear or leggings, or both, was between Defendant Parker's gloved hand and Ms.

---

[7] Defendants explained that the purpose of asking the traveler to stand in this position is to keep the individual at a physical disadvantage if he or she initiates violence against the searching or witnessing officer.  (ECF No. 66-6, JDTA at 173-177.)

Lovell's skin. (*Id*., at 208; ECF No. 63, Pl. 56.1 Reply, ¶¶ 102-03, 107.)

Defendant Parker testified that she did not insert her fingers into Ms. Lovell's vagina or squeeze Ms. Lovell's breasts. Defendant Parker testified that she patted down Ms. Lovell's chest area, over her clothing, for contraband. (ECF Nos. 66-6, JDTA at 181, 196, 197; 62-2 Def. Ex. C, OIG Parker Interview 4/12/17 at 3.) As a part of the chest search, Defendant Parker testified that she slid her fingers under the "boning" of Ms. Lovell's bra and bra straps (above the breast) and patted down the "section of bra between the breasts." (ECF Nos. 66-6, JDTA at 106, 179; 62-2 Def. Ex. C, OIG Parker Interview 4/12/17 at 3.)

According to Defendant Parker, she then patted down the area between Ms. Lovell's legs and Ms. Lovell's buttocks using one hand. (ECF Nos. 66-6, JDTA at 181, 206, 213; 62-2 Def. Ex. C, OIG Parker Interview 4/12/17, at 3.) Defendant Parker said that she searched Ms. Lovell groin area by touching the clothed outer area of Ms. Lovell's groin, over the leggings, with the back of her hand. (ECF No. 66-6, JDTA at 181.) She said she took her right hand with the fingers closed together and thumb inside her hand and slid the back of her hand under Ms. Lovell's groin. (*Id*. at 69.) Defendant Parker testified that this was a "standard pat-down" and denied "inserting

fingers into the vagina." (*Id*. at 65.) Defendant Parker then patted down Ms. Lovell's legs from the thigh downward. (*Id*. at 215.) Defendant Parker ended the pat-down by searching Ms. Lovell's shoes and scalp for contraband. (*Id*., ¶¶ 104-05.)

The parties agree that the entirety of the search-including the moment Ms. Lovell entered the pat-down room until Defendant Parker finished searching Ms. Lovell's scalp and shoes-lasted approximately two minutes. (*Id*., ¶ 109.) Defendant Parker exited the room and informed Roman that she did not find any contraband during her search. (*Id*., ¶ 110.) Ms. Lovell asserts that Defendant Parker exited the room "to laugh at" Ms. Lovell. (*Id*.) Roman and Defendant Twarowski then both reentered the room to speak with Ms. Lovell and Roman told Ms. Lovell that she was searched due to her extensive travel. (*Id*., ¶ 110-116; ECF No. 66-6, JDTA at 219-220.)

At approximately 10:22 p.m., Defendant Twarowski entered the private search room and returned Ms. Lovell's passport to her. (*Id*., ¶¶ 114, 116.) At approximately 10:23 p.m., Ms. Lovell gathered her belongings and exited the secondary search room. (*Id*., ¶¶ 117-118.)

**D. After Ms. Lovell's Pat-down**

Ms. Lovell testified that her father picked her up from JFK and took her to Syosset Hospital directly. (ECF Nos. 63, Pl. 56.1 Reply, ¶ 126; 66-6, JDTA at 184-85.) Ms. Lovell

had an external rape kit conducted at the hospital and requested that the hospital call the police.  (ECF Nos. 63, Pl. 56.1 Reply, ¶¶ 127-29; 66-6, JDTA at 184-85.)  A Port Authority of New York and New Jersey Police Department Detective arrived and took Ms. Lovell's statement.  (ECF No. 63, Pl. 56.1 Reply, ¶ 130.)

About a week later, Ms. Lovell met with a representative of the Queens County District Attorney and described the incident to the attorneys there, alleging that Defendant Parker "sexually assaulted" her.  (*Id.*, ¶ 133; ECF No. 66-6, JDTA at 185.)  The District Attorney's Office declined to prosecute Parker based on insufficient evidence of a violation of New York State Penal Law 130.52, Forcible Touching.  (ECF Nos. 63, Pl. 56.1 Reply, ¶ 134; 62-11 Def. Ex. O, Queens County Declination of Prosecution at 2.)

In December 2016, the Department of Homeland Security Office of Inspector General ("OIG") also opened an investigation into Ms. Lovell's allegations.  (ECF No. 63, Pl. 56.1 Reply, ¶ 136.)  The OIG interviewed each Defendant and Roman, but Ms. Lovell challenges the veracity of the interviews.  (*Id.*, ¶ 138; *see also* ECF Nos. 62-1 Def. Ex. B, OIG Twarowski Interview 12/13/16; 62-2 Def. Ex. C, OIG Parker Interview 4/12/17; 62-3 Def. Ex. E, OIG Muñoz Interview 12/16/16.)  Neither Parker nor Muñoz have been disciplined by CBP for their actions on November

17

27, 2016, with regards to the pat-down search of Ms. Lovell. (*Id.*, ¶ 139; *see also* ECF Nos. 62-12 Def. Ex. P, Parker Decl., ¶¶ 5-6; 62-13, Def. Ex. Q, Muñoz Decl., ¶¶ 6-7.)  To Parker and Muñoz's knowledge, OIG has not proceeded with a complaint against them for their conduct with regards to Ms. Lovell. (*Id.*)

On October 5, 2017, Ms. Lovell filed an administrative claim with CBP pursuant to the Federal Tort Claims Act for $35,000,000 in "emotional distress, pain, and suffering damages." (ECF No. 62-14, Def. Ex. R, Tameika Lovell's SF-95 Form.)  Ms. Lovell's claim is based on allegedly being subject to an "unsupervised unlawful 'body cavity search'" in which she was "'forced to squat'" and the officers "squeezed her breasts" and an officer 'forcibly' inserted four (4) fingers into her vagina."  On March 6, 2018, CBP denied Ms. Lovell's claim, finding that the "issues fall within the discretionary function exception to the government's waiver of sovereign immunity under the Federal Tort Claims Act."  (ECF No. 62-15, Def. Ex. S, Declination of Lovell's SF-95 Form.)

## II. Procedural History

Ms. Lovell commenced this action on March 28, 2018. (*See* ECF No. 1, Compl.)  On September 21, 2018, the parties participated in a pre-motion conference for the government's anticipated motion to dismiss and to discuss issues related to

service and Ms. Lovell's claims against the United States and
the CBP. (*See* Minute Entry Sept. 21, 2018.)  Thereafter, Ms.
Lovell filed a first amended complaint on September 28, 2018,
and Defendants answered on December 7, 2018. (*See* ECF Nos. 20,
First Am. Compl. at 2; 27, Reply to Compl. at 2.) Ms. Lovell
filed a second amended complaint on March 29, 2020, and
Defendants answered the second amended complaint on May 15,
2020.  (*See* ECF Nos. 38, Compl. at 3; 39, Reply to Compl. at 2.)
On January 12, 2021, Defendants filed a letter advising that
they intended to proceed by filing a dispositive summary
judgment motion.  (*See* ECF. No. 45, Def. Letter.)

        On November 5, 2021, the parties filed their summary
judgment briefing, their Local Rule 56.1 Statements regarding
summary judgment and supporting submissions.  (*See* ECF No. 66.)
On February 17, 2022, Defendants filed a letter advising the
Court of recent supplemental authority relevant to Defendants'
motion for summary judgment.  (ECF No. 67, Def. Supp. Auth.
Letter.)  On July 1 and 2, 2022, following this Court's order
directing further briefing, the parties each filed a memorandum
regarding the applicability of the recent Supreme Court opinion,
*Egbert v. Boule*, 142 S. Ct. 1763, 1797 (2022), to the instant
action.  (ECF Nos. 69, Def. Supp. Briefing; 70, Pl. Supp.
Briefing.)

**LEGAL STANDARD**

Summary judgment may be granted to a movant who demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). No "genuine" dispute exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby*, 477 U.S. at 249.

When bringing a motion for summary judgment, the movant carries the burden of demonstrating the absence of any disputed issues of material fact and an entitlement to judgment as a matter of law. *Rojas*, 660 F.3d at 104. In deciding a summary judgment motion, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A moving party may indicate the absence of a factual dispute by "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

Once the moving party has met its burden, the nonmoving party "must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  If a nonmoving party submits evidence that "is merely colorable, or is not significantly probative, summary judgment may be granted" against the party. *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).

## DISCUSSION

Plaintiff brought this action against the individual Defendants pursuant to *Bivens*, claiming violations of her Fourth and Fifth Amendment rights, and Defendants have moved for summary judgment on those claims.  Defendants argue that *Bivens* does not provide an implied constitutional cause of action for damages against a CBP officer for intercepting a traveler and conducting a routine pat-down search on her, and that the Court should not recognize one.  This Court agrees that a *Bivens* action is unavailable for Ms. Lovell's asserted violations of the Fourth and Fifth Amendment under the Supreme Court's *Bivens* decision and its progeny.  Even if a *Bivens* action were available, moreover, this Court would find that Defendants are entitled qualified immunity.

I.   *Bivens* Cause of Action

In *Bivens*, the Supreme Court held that "a person claiming to be the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages ... even though no federal statute authorized such a claim." *Hernández v. Mesa*, 140 S. Ct. 735, 741 (2020).  The Court subsequently extended *Bivens* to "cover two additional constitutional claims: in *Davis v. Passman*, 442 U.S. 228 (1979), the Court recognized a former congressional staffer's Fifth Amendment claim for unlawful dismissal based on sex; and in *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized a federal prisoner's Eighth Amendment claim for failure to provide adequate medical treatment.  *Id.*

After recognizing these three implied constitutional causes of action in which individual federal officers could be sued for damages, "the Court changed course." *Id*.  The Court's most recent decisions preclude the type of claims that Plaintiff advances here.

First, in *Ziglar v. Abbasi*, the Supreme Court "made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity."  137 S. Ct. 1843, 1857 (2017).  The Court noted that extending an implied constitutional cause of action "is a significant step under separation-of-powers principles," and the Court held that Congress is the branch of government

with the "substantial responsibility to determine whether, and
the extent to which, monetary and other liabilities should be
imposed upon individual officers and employees of the Federal
Government." *Id*. at 1856.  The *Abbasi* Court confirmed, that for
decades since *Bivens*, the Supreme Court has, "consistently
refused to extend *Bivens* to any new context or new category of
defendants." *Id*. at 1856-57 (cautioning against creating
additional implied remedies "no matter how desirable that might
be as a policy matter").

The *Abbasi* Court considered two inquiries in
determining whether to extend *Bivens.*  First, the Court inquired
whether the claim arose in a "new context" or involved a "new
category of defendants." *Id*. at 1849.  Second, the Court asked
whether there were "special factors counselling hesitation in
the absence of affirmative action by Congress" to grant the
extension. *Id*.  In *Abassi*, the Court considered whether to
extend a *Bivens* action to persons detained as suspected
terrorists after the September 11 attacks such that they could
bring claims against federal officials responsible for their
allegedly unconstitutional detention. *Id*. at 1852-53.  In
refusing to extend *Bivens*, the Court explained that courts have
shown deference to what the Executive Branch "has determined is
essential to national security." *Id*. at 1861 (internal
quotations omitted).  For matters concerning national security,

the *Abassi* Court held that the "balance to be struck" "between deterring constitutional violations and freeing high officials to make the lawful decisions necessary to protect the Nation is one for Congress, not the Judiciary."  *Id.* at 1865.

Second, in *Hernández v. Mesa*, the Supreme Court applied *Abbasi* to reject a *Bivens* cause of action, in circumstances involving actions of federal officers at the nation's border.  In *Hernández*, the Supreme Court denied a *Bivens* claim to the parents of a Mexican teenager who was shot and killed by a Border Patrol agent.  *Id.* at 740-41.  The Supreme Court denied *Bivens* relief because the claims implicated national security issues, given that Border Patrol agents are "responsible for preventing the illegal entry of people and goods into the United States."  *Id.* at 746.  The *Hernández* Court reiterated that courts are not well equipped to make decisions that implicate foreign policy and national security, and these institutional-capacity concerns are "heightened" when it comes to judicially created constitutional remedies.  *Id.* at 749.

If *Hernández* left any doubt as to the availability of a *Bivens* claim for damages against government officials for conduct that implicates border security or national security, the Supreme Court has removed that doubt.  This past term, the Supreme Court in *Egbert v. Boule* considered a Fourth Amendment excessive force and First Amendment retaliation claim against a

CBP agent.  142 S. Ct. 1763, 1797 (2022).  The Court reiterated that "a cause of action under *Bivens* is 'a disfavored judicial activity."  *Id.*  The Court synthesized its past precedents, further limiting any potential expansion of *Bivens*.  As the Court explained, "'[e]ven a single sound reason to defer to Congress' is enough to require a court to refrain from creating such a remedy."  *Id.* at 1803.  The Court accordingly condensed the two-part test in *Abbasi* into a "single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy."  *Id.*  In *Boule*, the Supreme Court also posed the question "whether a court is competent to authorize a damages action…against Border Patrol agents generally" and concluded with a resounding "no."  *Id.* at 1806.

The *Boule* Court thus echoed its previous holding in *Hernández* of declining to create a damages remedy for an excessive-force claim against Border Patrol agents—except in *Boule*, an agent entered Plaintiff's business without a warrant and threw Plaintiff to the ground, injuring him.  The Court explained that the agent was carrying out CBP's mandate to "interdic[t] persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States" pursuant to 6 U.S.C. § 211(e)(3)(A), and that a *Bivens* cause of action "may not lie where, as here,

national security is at issue." *Id.* at 1805.  The Court noted
that if Congress has provided alternative remedies for aggrieved
parties, as it did with CBP, by enacting a grievance procedure
that allowed for investigations into an agent's conduct, then
that legislative choice independently forecloses a *Bivens*
action.  *Id.* at 1806.  The Court found that the Border Patrol's
grievance process afforded "adequate deterrence" for officer
misconduct and afforded the plaintiff an alternative remedy.
*Id.*

      Under binding Supreme Court precedent, then, Ms.
Lovell may not maintain a cause of action against the individual
Defendants pursuant to *Bivens*.  Ms. Lovell brings suit against
individual CBP officers on duty at a border checkpoint within an
international airport.  There is no question that the Defendant
officers performed functions instrumental to border security.
Defendant officers were charged with identifying and
intercepting individuals who may attempt to bring contraband or
illicit substances into the country and were authorized to
perform routine pat-downs in the interest of maintaining the
national security, by searching for contraband or other
dangerous items.  (*See* ECF No. 63, Pl. 56.1 Reply Statement, ¶7;
see also ECF No. 62-4, Def. Ex. F, CBP Personal Search
Handbook.)

The defendants Ms. Lovell names in her *Bivens* suit are thus substantially in the same position as the officers for whom the Supreme Court in *Boule* rejected a *Bivens* action.  If anything, this case is more straight-forward than *Boule*; whereas *Boule* involved the actions of CBP officers in the domestic territory of the United States, this action involves conduct by CBP officials at an international border, where considerations of border security are even more pronounced.  *See Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) (finding that airports where international flights arrive are the "functional equivalent" of a border for purposes of routine border searches.)

Furthermore, Ms. Lovell accessed alternative remedies, with the Port Authority of New York and New Jersey Police Department, the Queens County District Attorney's office, and the DHS OIG, which investigated her allegations against Defendants, including conducting interviews with the three Defendants.  And though the existence of the Federal Tort Claims Act has never precluded *Bivens* remedies, it is notable that Ms. Lovell also filed an administrative tort claim with the Department of Homeland Security, the agency overseeing CBP.  "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of

deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Boule*, 1763 S. Ct. at 1807.

Even if *Boule* were not controlling outright, the two former inquiries-now considerations-expressed in the Supreme Court's *Bivens* precedents would preclude Ms. Lovell's claim. First, the instant case arises in a new context, because a *Bivens* action targeting the conduct of CBP officers at a border entry point has never been recognized by the Supreme Court. Ms. Lovell argues that her case "is precisely the kind of search-and-seizure case where application of *Bivens* has been affirmed by the Supreme Court as 'a fixed principle in the law.'" (ECF No. 66-3, Pl. Opp'n to Summ. J. at 7) (quoting *Abassi*, 137 S. Ct. at 1856-57.) But the Supreme Court in *Abassi* did not hesitate in declaring a new non-actionable context, despite the Fourth and Fifth Amendment search-and-seizure claims involving allegedly unconstitutional strip searches. Instead, what constitutes a new context for purposes of *Bivens* is a "broad" inquiry, and a claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized. *Hernández*, 140 S. Ct. at 743. "Examples of differences that 'are meaningful enough to make a given context a new one' include: the rank of officers involved; the constitutional right; the specificity of the action; the extent of judicial guidance on

how an officer should respond; the risk of intrusion by the judiciary into the function of other branches; or other special factors." *Abassi*, 137 S. Ct. at 1849.  Ms. Lovell's Fourth and Fifth Amendment constitutional claims are rooted in an "unlawful pat-down, secondary, and body cavity search due to her race and gender." (ECF No. 66-3, Pl. Opp'n to Summ. J. at 1.)  But the context of a border search here is a far cry from the events in *Bivens*, where federal agents entered a plaintiff's home without a warrant and subjected him to a visual strip search.  Nor is it akin to the Fifth Amendment context alleged in *Davis*, the dismissal of a congressional employee on the basis of sex discrimination.

Even if the context is familiar, as Ms. Lovell's counsel argues, there are "special factors counseling hesitation" to providing a *Bivens* remedy in this case. *Abassi* 137 S. Ct. at 1857.  Similar to the question highlighted in *Boule*, the "special factors" question requires the Court to decide whether the courts are well suited, in place of Congress, to decide that an action should lie.  The *Abassi* Court, in considering special factors for a claim similar to the one here, expressly stated that "[n]ational-security policy is the prerogative of the Congress and President" and that "the risk of disruptive intrusion by the Judiciary into the functioning of other branches" was far too great.  *Id.* at 1861.  The Supreme

Court reasoned that "the risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy." *Id.* The need for CBP officers to monitor the security of international terminals is a component of the nation's security, and counsels significantly against fashioning a new implied constitutional claim. Moreover, the presence of an alternative remedy "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1858.

At least since *Abassi*, the Supreme Court has made it clear that courts should be particularly cautious about extending *Bivens* beyond the three cases in which the Supreme Court has "approved of an implied damages remedy under the Constitution itself." *Abbasi*, 137 S. Ct. at 1855. *Boule* further clarified that Fourth or Fifth Amendment cases against CBP officers are distinct from the original *Bivens* case against Federal Bureau of Narcotics agents. Ms. Lovell's circumstances are "different in a meaningful way from previous *Bivens* cases decided by the Supreme Court," and the Supreme Court disfavors judicial inquiry into matters of national security. *See Abassi*, 137 S. Ct. at 1859. Moreover, Ms. Lovell has access to alternative remedies. Consequently, this Court must and does conclude that Plaintiff does not have an available *Bivens* cause of action.

## II.   Merits of Constitutional Claims

### A. *Fourth Amendment Claim - Qualified Immunity*

Finally, even if Ms. Lovell had a cause of action under *Bivens*, her constitutional claims would not survive summary judgment on the merits.  The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, under a qualified immunity analysis, courts assess constitutional claims following a two-part framework: first, by inquiring whether there is a constitutional violation and second, by asking whether the defendants are nonetheless protected under the doctrine of qualified immunity.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  As the Supreme Court has instructed, however, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.  Even assuming that disputed facts exist as to whether Ms. Lovell's constitutional rights were violated, this Court addresses only whether Defendants are entitled qualified immunity and determines that they are.

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)). Regarding whether the legal rules were "clearly established" at the time the action was taken, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (citing *Townes v. City of New York,* 176 F.3d 138, 144 (2d Cir. 1999)).

In other words, "the relevant question is whether a reasonable officer could have believed the [challenged conduct] to be lawful, in light of clearly established law and the information the ... officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Importantly, a federal officer is entitled to qualified immunity even if his decision was mistaken, so long as the decision was reasonable. *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994) (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Further, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of

fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted).  In sum, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter*, 502 U.S. at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

This Court finds that Defendants could have reasonably "believed the [challenged conduct] to be lawful, in light of clearly established law and the information the ... officer[ ] possessed." *Creighton*, 483 U.S. 641 (1987).  The Fourth Amendment of the Constitution prohibits all unreasonable searches of a person or their effects.  An illegal search occurs when the government violates a reasonable "expectation of privacy" or "obtains information by physically intruding on a constitutionally protected area." *Carpenter v. United States*, 138 S. Ct. 2206 (2018).  Typically, a warrant is required to override this right, but, "[i]n the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. 373 (2014).

The Supreme Court has long accepted that constitutional protections are more limited at the border than within the domestic United States.  Fourth Amendment

jurisprudence recognizes searches and seizures at international borders as exceptions to the usual strictures of the Fourth Amendment. *See United States v. Ramsey*, 431 U.S. 606, 617–19 (1977) ("Border searches…from before the adoption of the Fourth Amendment, have been considered to be reasonable by the single fact that the person or item in question had entered into our country from outside."); *see also United States v. Montoya de Hernández,* 473 U.S. 531, 537 (1985)("Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.") Because people can enter the country at points other than along the border, courts have concluded that stops and searches conducted at the first point at which an entrant may practically be detained to be the "functional equivalent" of the border. *See Almeida-Sanchez*, 413 U.S. 273 (1973); *see also United States v. Bareno-Burgos*, 739 F. Supp. 772, 778 (E.D.N.Y. 1990) ("Case law reflects that the functional equivalent of the border need bear no particular time or space relationship to the actual border.")

Under what is known as the border-search exception, searches performed at international terminals do not generally require a warrant, probable cause, or reasonable suspicion. *Id*.

Border searches are widely held to be within the government's
most expansive authority because of the government's "inherent
authority to protect, and a paramount interest in protecting,
its territorial integrity." *United States v. Flores-Montano*,
541 U.S. 149 (2004).  The Supreme Court has recognized that
searches at the border are "qualitatively different" from those
occurring in the interior of the United States, because persons
entering the country have less robust expectations of privacy,
given the federal government's broad power to safeguard the
nation by examining persons seeking to enter its territory.  *See
Montoya de Hernández*, 473 U.S. 531, 538-39 (1985).
Consequently, courts allow border patrol agencies such as CBP
broad latitude to conduct routine inspections and searches of
travelers without a warrant or any particularized suspicion of
unlawful activity.

          Typically, the standard applied to border searches
depends on whether the search is deemed to be routine or not.
Courts consider all common and routine searches of a traveler to
be *de facto* reasonable, while searches that are non-routine
require a "reasonable suspicion."  *See, e.g., Ramsey*, 431 U.S.
at 616 ("That searches made at the border, pursuant to the long-
standing right of the sovereign to protect itself by stopping
and examining persons and property crossing into this country,
are reasonable simply by virtue of the fact that they occur at

the border, should, by now, require no extended demonstration."); *see also Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007) ("It is well established that the government has broad powers to conduct searches at the border even where . . . there is no reasonable suspicion that the prospective entrant has committed a crime."). Routine searches include searches of outer clothing, luggage, a purse, wallet, pockets, or shoes which all "do not substantially infringe on a traveler's privacy rights." *See United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006). But a border search that extends beyond a routine search and inspection may require at least reasonable suspicion. The Supreme Court has not precisely defined the scope of a routine border search but has suggested that highly intrusive searches may fall outside that category and thus require heightened suspicion to withstand Fourth Amendment scrutiny. *See Flores-Montano*, 541 U.S. at 152–54, 156.

Here, Ms. Lovell does not appear to challenge the agents' authority to conduct searches at an international border. Instead, Ms. Lovell contends that the nature of the search violated her constitutional rights. The Supreme Court has required agents to meet a "reasonable suspicion" standard whenever a search is deemed nonroutine. Examples of nonroutine searches typically include physical searches of the body and the removal of clothing. In *United States v. Montoya de Hernández*,

36

the Court held that a strip search revealing nearly 100 balloons of cocaine in the searched individual's gastrointestinal system went beyond a "routine" search and thus required "reasonable suspicion."  473 U.S. 531 (1985); *see also Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (explaining that reasonable suspicion would be required for a more invasive search and the inquiry "simply considers, after taking into account all the facts of a particular case, 'whether the border official ha[d] a reasonable basis on which to conduct the search.'").  The *Montoya de Hernández* Court specified that the "reasonable suspicion" standard "fits well into situations involving alimentary canal smuggling at the border" because the "governmental interests in stopping smuggling at the border are high" and that "[a]uthorities must be allowed 'to graduate their response to the demands of any particular situation.'" *See Montoya de Hernández*, 473 U.S. 531, 542 (1985) (quoting *United States v. Place*, 462 U.S. 696, 709, n. 10, 103 S.Ct. 2637, 2646, n. 10, 77 L.Ed.2d 110 (1983)).  The Second Circuit has pointed to several factors courts may consider in making the reasonable suspicion determination, including: unusual conduct of the defendant, loose-fitting or bulky clothing, evasive or contradictory answers, excessive nervousness, a suspicious itinerary, or discovery of incriminating matter during routine searches. *United States v. Asbury*, 586 F.2d 973, 976 (2d Cir. 1978).

Outside of the border context, the Second Circuit has found that body cavity searches with physical contact (i.e., manual body cavity searches) necessitate an even stronger justification. *Sloley v. VanBramer*, 945 F.3d 30 (2d Cir. 2019); s*ee Wilson v. Aquino*, 233 F. App'x 73, 75–76 (2d Cir. 2007) (finding a strip search that turned into a manual examination of body cavities was illegal as a matter of law); S*ec. & L. Enf't Emps., Dist. Council 82, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO by Clay v. Carey*, 737 F.2d 187, 208 (2d Cir. 1984)(holding that a visual body-cavity search had to have been related to some indication that contraband was carried into a facility in the searched individual's body cavities); *see also Monroe v. Gould*, 372 F. Supp. 3d 197 (S.D.N.Y. 2019)(finding physical cavity searches to be "the most invasive type of search" and receive the most scrutiny when determining "reasonableness"). As the Supreme Court has recognized, "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." *Schmerber v. California,* 384 U.S. 757, 769–70 (1966).

The Second Circuit, however, has not addressed manual body cavity searches in the context of international borders, where the Fourth Amendment's protections are necessarily diminished. The Second Circuit has only generally held that "an

intrusive body search is justified only if the border official can articulate facts based upon something more than the border crossing that raise the suspicion of illegal concealment...the reasonableness of such a search is determined by balancing the legitimate governmental interests against the offensiveness of the intrusion." *United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir. 1985). The Supreme Court, however, has specified that the heightened standard of reasonable suspicion requires only "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396; *Irving*, 452 F.3d 110, 123 (2d Cir. 2006). In *Ogberaha,* the Second Circuit found sufficient "reasonable suspicion" to justify a strip search to locate contraband in a traveler's vagina due to the fact that the traveler had traveled from a "source" country, for a short period of time, with little luggage, and behaved nervously. *Id.* at 658. There, a traveler flying into JFK was asked to remove a condom filled with cocaine from her vagina, though the government officers did not engage in "any physical contact." *Id.*

The Second Circuit's precedents concerning intrusive searches of the body underscore the uncertainty in this area of Fourth Amendment jurisprudence and disprove the notion that a reasonable officer knew or should have known that the alleged conduct under the circumstances in this case was

unconstitutional.  Though courts have subjected manual body cavity searches to the most exacting scrutiny, the Second Circuit has never imported that framework to the context of border searches.  On the contrary, the Second Circuit has suggested that, regardless of the nature of the strip search, a "reasonable suspicion" standard applies at an international border.  *Ogberaha*, 771 F.2d at 658 (finding the standard "flexible enough to afford the full measure of protection which the fourth amendment commands"). And the Second Circuit has not addressed whether the security interests that accompany the management of international airports—where travelers are known to secrete contraband in or near body cavities—may support a greater degree of latitude under the Fourth Amendment in conducting cavity searches than in the everyday, civil context.

The most analogous case on point countenances a level of reasonable suspicion that may well be met here.  Like the traveler in *Ogberaha* who presented a few indicators of suspicious activity, Ms. Lovell had unusual travel patterns, potential gaps in her narrative of being a school counselor and where she stayed in Jamaica (despite purportedly visiting regularly).  Even assuming that the manner of the search of Ms. Lovell's breast and groin area was unconstitutional under the circumstance, in light of Second Circuit precedent, the Court cannot find that the officers knew or should have known that

touching those areas over Ms. Lovell's clothing during a pat-down search was clearly unconstitutional.  The Second Circuit has found a search of a traveler's vagina based on substantially the same degree of suspicion as was present here to be within constitutional bounds.  *Ogberaha*, 771 F.2d at 659-60.

        In deciding Defendants' summary judgment motion, the Court accepts as true Ms. Lovell's testimony that Defendant Parker "inserted her fingers into [Ms. Lovell's] vagina" over Ms. Lovell's clothing.  Neither the Supreme Court nor the Second Circuit, however, has addressed the circumstances in which an officer may conduct manual body cavity searches over the surface of an individual's clothing-—whether in the border search context or not.  Here, construing the facts in a manner favorable to Ms. Lovell, where Ms. Lovell indisputably was not asked to remove her clothing and Defendant Parker's gloved hand did not make contact with Ms. Lovell's skin, it is not clearly established that the manner of search conducted by Defendant Parker, required anything more than the articulated factors of reasonable suspicion that the Second Circuit accepted as sufficient in *Ogberaha*.  And Ms. Lovell's own testimony demonstrates that Defendant Parker indeed had some suspicion that there was contraband in her groin area: Ms. Lovell testified that while conducting the pat-down of Ms. Lovell's groin area, Defendant Parker inquired, "what is down there?"

Considering that Defendants had a sufficient basis to search for hidden contraband, and the undisputed facts indicate that they suspected contraband could be hidden in Ms. Lovell's groin area that was initially obscured by her sweatshirt, the Court finds that the law was not and still is not sufficiently established for Defendant Parker to have known that the manner of her pat-down of Ms. Lovell was unconstitutional.

In the instant case, based on the totality of circumstances, the manner of Ms. Lovell's pat-down was not unconstitutional under any existing case law.   Therefore, this Court finds that the right to be protected from a cavity search over clothing, when officers have reasonable suspicion that an individual may be smuggling contraband at a border entry point, was not clearly established at the time Defendants conducted the search of Ms. Lovell.   Accordingly, the Defendants are entitled to qualified immunity.

**B.** ***Fifth Amendment Claim***

The Court also finds that Ms. Lovell's Fifth Amendment claim was unsupported by evidence or statutory authority to warrant its survival on summary judgment. *See Transflo Terminal Servs., Inc. v. Brooklyn Res. Recovery, Inc.*, 248 F. Supp. 3d 397, 399 (E.D.N.Y. 2017) ("Conclusory statements, devoid of specifics, are insufficient to defeat a properly supported motion for summary judgment."); *see also Johnson v. Harron*, No.

91-CV-1460, 1995 WL 319943, at *34 (N.D.N.Y. May 23, 1995), on reconsideration in part, No. 91-CV-1460, 1995 WL 411175 (N.D.N.Y. July 6, 1995)("The cursory treatment given this claim leaves the court to wonder how seriously the parties consider it to be."). There is no evidence in the record from which a jury could find that Defendants specifically targeted Ms. Lovell for a search due to her race and gender, other than the conclusory statement that Defendants were motivated by animus. In fact, aside from asserting the claim itself, Ms. Lovell's counsel's briefing does not provide any evidence, arguments, or details in support of her claim. (*See* ECF Nos. 66-3 Pl. Opp'n. to Summ. J.; 70, Pl. Supp. Briefing.) Ms. Lovell cannot defeat summary judgment by "offering purely conclusory allegations of discrimination," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), or by offering evidence in opposition that is merely speculative. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116-1117 (2d Cir.1988). Instead, to defeat summary judgment, the nonmoving party must set forth "concrete particulars" showing that a trial is needed to resolve disputed issues of material fact, which Ms. Lovell has failed to do. R.*G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984).

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety.  The Clerk of Court is respectfully requested to enter judgment for Defendants and close this case.

SO ORDERED.

                                       /s/

Hon. Kiyo A. Matsumoto

United States District Judge

Eastern District of New York


Dated: Brooklyn, New York

August 3, 2022